BOARD OF REGENTS OF THE UNIVERSITY OF
WISCONSIN SYSTEM *v.* SOUTHWORTH ET AL.

No. 98–1189.   Argued November 9, 1999—Decided March 22, 2000

218

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, THOMAS, and GINSBURG, JJ., joined. SOUTER, J., filed an opinion concurring in the judgment, in which STEVENS and BREYER, JJ., joined, *post*, p. 236.

*Susan K. Ullman*, Assistant Attorney General of Wisconsin, argued the cause for petitioner. With her on the briefs were *James E. Doyle*, Attorney General, and *Peter C. Anderson*, Assistant Attorney General.

*Jordan W. Lorence* argued the cause for respondents. With him on the brief was *Daniel Kelly*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Eliot Spitzer*, Attorney General of New York, *Preeta D. Bansal*, Solicitor General, *Peter H. Schiff*, Deputy Solicitor General, *Laura Etlinger*, Assistant Attorney General, and *Mark B. Rotenberg*, and by the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *Thurbert E. Baker* of Georgia, *Thomas R. Keller* of Hawaii, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Joseph P. Mazurek* of Montana, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, and *Paul G. Summers* of Tennessee; for the State of Oregon by *Hardy*

JUSTICE KENNEDY delivered the opinion of the Court.

For the second time in recent years we consider constitutional questions arising from a program designed to facilitate

*Myers,* Attorney General, *David Schuman,* Deputy Attorney General, and *Michael D. Reynolds,* Solicitor General; for the American Civil Liberties Union et al. by *Jon G. Furlow, Steven R. Shapiro, Elliot M. Mincberg,* and *Judith E. Schaeffer;* for the American Council on Education et al. by *Stephen S. Dunham, Leonard M. Niehoff,* and *Sheldon E. Steinbach;* for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess,* and *Laurence Gold;* for the Brennan Center for Justice at New York University School of Law by *Scott D. Makar, Robert Bergen, Michael J. Frevola,* and *Burt Neuborne;* for the Lesbian, Gay, Bisexual, and Transgender Campus Center at UW-Madison et al. by *Patricia M. Logue* and *Ruth E. Harlow;* for the National Legal Aid Defenders Association, Student Legal Services Section, by *Ned R. Jaeckle* and *Kathleen A. Cushing;* for the National Education Association by *Robert H. Chanin, Andrew D. Roth,* and *Michael D. Simpson;* for the New York Public Interest Research Group by *Alexander R. Sussman;* for the Student Press Law Center et al. by *Lucy A. Dalglish;* for Student Rights Law Center, Inc., by *Mitchel D. Grotch;* for the United States Student Association et al. by *David C. Vladeck* and *Alan B. Morrison;* for United Council of University of Wisconsin Students, Inc., by *Mark B. Hazelbaker;* for the University of California Student Association by *Michael S. Sorgen* and *Amy R. Levine;* and for the Wisconsin Student Public Interest Research Group et al. by *Daniel H. Squire, Craig Goldblatt,* and *Francisco Medina.*

Briefs of *amici curiae* urging affirmance were filed for the Atlantic Legal Foundation by *Martin S. Kaufman* and *Edwin L. Lewis III;* for the American Center for Law and Justice by *Jay Alan Sekulow, Mark Nathan Troobnick,* and *James Matthew Henderson, Sr.;* for the Christian Legal Society by *Steven T. McFarland, Samuel B. Casey,* and *Thomas C. Berg;* for the Family Research Institute by *Roy H. Nelson;* for Liberty Counsel by *Mathew D. Staver;* for the National Legal Foundation by *Barry C. Hodge;* for the National Right to Work Legal Defense Foundation, Inc., by *Raymond J. LaJeunesse, Jr.;* for the National Smokers Alliance by *Renee Giachino;* for the Pacific Legal Foundation et al. by *Deborah J. La Fetra;* and for the Washington Legal Foundation et al. by *Daniel E. Troy, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* were filed for Americans United for Separation of Church and State et al. by *Steven K. Green, Steven M. Freeman,* and *Ayesha N. Khan;* for First Freedoms Foundation by *Michael D. Dean;* for

extracurricular student speech at a public university. Respondents are a group of students at the University of Wisconsin (hereinafter University). They brought a First Amendment challenge to a mandatory student activity fee imposed by petitioner Board of Regents of the University of Wisconsin System and used in part by the University to support student organizations engaging in political or ideological speech. Respondents object to the speech and expression of some of the student organizations. Relying upon our precedents which protect members of unions and bar associations from being required to pay fees used for speech the members find objectionable, both the District Court and the Court of Appeals invalidated the University's student fee program. The University contends that its mandatory student activity fee and the speech which it supports are appropriate to further its educational mission.

We reverse. The First Amendment permits a public university to charge its students an activity fee used to fund a program to facilitate extracurricular student speech if the program is viewpoint neutral. We do not sustain, however, the student referendum mechanism of the University's program, which appears to permit the exaction of fees in violation of the viewpoint neutrality principle. As to that aspect of the program, we remand for further proceedings.

## I

The University of Wisconsin is a public corporation of the State of Wisconsin. See Wis. Stat. § 36.07(1) (1993–1994). State law defines the University's mission in broad terms: "to develop human resources, to discover and disseminate knowledge, to extend knowledge and its application beyond the boundaries of its campuses and to serve and stimulate society by developing in students heightened intellectual, cultural and humane sensitivities . . . and a sense of purpose."

the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden;* and for Owen Brennan Rounds et al. by *Thomas H. Nelson.*

§ 36.01(2). Some 30,000 undergraduate students and 10,000 graduate and professional students attend the University's Madison campus, ranking it among the Nation's largest institutions of higher learning. Students come to the renowned University from all 50 States and from 72 foreign countries. Last year marked its 150th anniversary; and to celebrate its distinguished history, the University sponsored a series of research initiatives, campus forums and workshops, historical exhibits, and public lectures, all reaffirming its commitment to explore the universe of knowledge and ideas.

The responsibility for governing the University of Wisconsin System is vested by law with the board of regents. § 36.09(1). The same law empowers the students to share in aspects of the University's governance. One of those functions is to administer the student activities fee program. By statute the "[s]tudents in consultation with the chancellor and subject to the final confirmation of the board [of regents] shall have the responsibility for the disposition of those student fees which constitute substantial support for campus student activities." § 36.09(5). The students do so, in large measure, through their student government, called the Associated Students of Madison (ASM), and various ASM subcommittees. The program the University maintains to support the extracurricular activities undertaken by many of its student organizations is the subject of the present controversy.

It seems that since its founding the University has required full-time students enrolled at its Madison campus to pay a nonrefundable activity fee. App. 154. For the 1995–1996 academic year, when this suit was commenced, the activity fee amounted to $331.50 per year. The fee is segregated from the University's tuition charge. Once collected, the activity fees are deposited by the University into the accounts of the State of Wisconsin. *Id.*, at 9. The fees are drawn upon by the University to support various campus services and extracurricular student activities. In the Uni-

versity's view, the activity fees "enhance the educational experience" of its students by "promot[ing] extracurricular activities," "stimulating advocacy and debate on diverse points of view," enabling "participa[tion] in political activity," "promot[ing] student participa[tion] in campus administrative activity," and providing "opportunities to develop social skills," all consistent with the University's mission. *Id.*, at 154–155.

The board of regents classifies the segregated fee into allocable and nonallocable portions. The nonallocable portion approximates 80% of the total fee and covers expenses such as student health services, intramural sports, debt service, and the upkeep and operations of the student union facilities. *Id.*, at 13. Respondents did not challenge the purposes to which the University commits the nonallocable portion of the segregated fee. *Id.*, at 37.

The allocable portion of the fee supports extracurricular endeavors pursued by the University's registered student organizations or RSO's. To qualify for RSO status students must organize as a not-for-profit group, limit membership primarily to students, and agree to undertake activities related to student life on campus. *Id.*, at 15. During the 1995–1996 school year, 623 groups had RSO status on the Madison campus. *Id.*, at 255. To name but a few, RSO's included the Future Financial Gurus of America; the International Socialist Organization; the College Democrats; the College Republicans; and the American Civil Liberties Union Campus Chapter. As one would expect, the expressive activities undertaken by RSO's are diverse in range and content, from displaying posters and circulating newsletters throughout the campus, to hosting campus debates and guest speakers, and to what can best be described as political lobbying.

RSO's may obtain a portion of the allocable fees in one of three ways. Most do so by seeking funding from the Student Government Activity Fund (SGAF), administered

by the ASM. SGAF moneys may be issued to support an RSO's operations and events, as well as travel expenses "central to the purpose of the organization." *Id.*, at 18. As an alternative, an RSO can apply for funding from the General Student Services Fund (GSSF), administered through the ASM's finance committee. During the 1995–1996 academic year, 15 RSO's received GSSF funding. These RSO's included a campus tutoring center, the student radio station, a student environmental group, a gay and bisexual student center, a community legal office, an AIDS support network, a campus women's center, and the Wisconsin Student Public Interest Research Group (WISPIRG). *Id.*, at 16–17. The University acknowledges that, in addition to providing campus services (*e. g.*, tutoring and counseling), the GSSF-funded RSO's engage in political and ideological expression. Brief for Petitioner 10.

The GSSF, as well as the SGAF, consists of moneys originating in the allocable portion of the mandatory fee. The parties have stipulated that, with respect to SGAF and GSSF funding, "[t]he process for reviewing and approving allocations for funding is administered in a viewpoint-neutral fashion," *id.*, at 14–15, and that the University does not use the fee program for "advocating a particular point of view." *Id.*, at 39.

A student referendum provides a third means for an RSO to obtain funding. *Id.*, at 16. While the record is sparse on this feature of the University's program, the parties inform us that the student body can vote either to approve or to disapprove an assessment for a particular RSO. One referendum resulted in an allocation of $45,000 to WISPIRG during the 1995–1996 academic year. At oral argument, counsel for the University acknowledged that a referendum could also operate to defund an RSO or to veto a funding decision of the ASM. In October 1996, for example, the student body voted to terminate funding to a national student organization to which the University belonged. *Id.*, at 215. Both parties

confirmed at oral argument that their stipulation regarding the program's viewpoint neutrality does not extend to the referendum process.  Tr. of Oral Arg. 19, 29.

With respect to GSSF and SGAF funding, the ASM or its finance committee makes initial funding decisions.  App. 14–15.  The ASM does so in an open session, and interested students may attend meetings when RSO funding is discussed.  *Id.*, at 14.  It also appears that the ASM must approve the results of a student referendum.  Approval appears *pro forma,* however, as counsel for the University advised us that the student government "voluntarily views th[e] referendum as binding."  Tr. of Oral Arg. 15.  Once the ASM approves an RSO's funding application, it forwards its decision to the chancellor and to the board of regents for their review and approval.  App. 18, 19.  Approximately 30% of the University's RSO's received funding during the 1995–1996 academic year.

RSO's, as a general rule, do not receive lump-sum cash distributions.  Rather, RSO's obtain funding support on a reimbursement basis by submitting receipts or invoices to the University.  Guidelines identify expenses appropriate for reimbursement.  Permitted expenditures include, in the main, costs for printing, postage, office supplies, and use of University facilities and equipment.  Materials printed with student fees must contain a disclaimer that the views expressed are not those of the ASM.  The University also reimburses RSO's for fees arising from membership in "other related and non-profit organizations."  *Id.*, at 251.

The University's policy establishes purposes for which fees may not be expended.  RSO's may not receive reimbursement for "[g]ifts, donations, and contributions," the costs of legal services, or for "[a]ctivities which are politically partisan or religious in nature."  *Id.*, at 251–252.  (The policy does not give examples of the prohibited expenditures.)  A separate policy statement on GSSF funding states that an RSO can receive funding if it "does not have a *primarily*

political orientation (i. e. is not a registered political group)." *Id.*, at 238. The same policy adds that an RSO "shall not use [student fees] for any lobbying purposes." *Ibid.* At one point in their brief respondents suggest that the prohibition against expenditures for "politically partisan" purposes renders the program not viewpoint neutral. Brief for Respondents 31. In view of the fact that both parties entered a stipulation to the contrary at the outset of this litigation, which was again reiterated during oral argument in this Court, we do not consider respondents' challenge to this aspect of the University's program.

The University's Student Organization Handbook has guidelines for regulating the conduct and activities of RSO's. In addition to obligating RSO's to adhere to the fee program's rules and regulations, the guidelines establish procedures authorizing any student to complain to the University that an RSO is in noncompliance. An extensive investigative process is in place to evaluate and remedy violations. The University's policy includes a range of sanctions for noncompliance, including probation, suspension, or termination of RSO status.

One RSO that appears to operate in a manner distinct from others is WISPIRG. For reasons not clear from the record, WISPIRG receives lump-sum cash distributions from the University. University counsel informed us that this distribution reduced the GSSF portion of the fee pool. Tr. of Oral Arg. 15. The full extent of the uses to which WISPIRG puts its funds is unclear. We do know, however, that WISPIRG sponsored on-campus events regarding homelessness and environmental and consumer protection issues. App. 348. It coordinated community food drives and educational programs and spent a portion of its activity fees for the lobbying efforts of its parent organization and for student internships aimed at influencing legislation. *Id.*, at 344, 347.

In March 1996, respondents, each of whom attended or still attend the University's Madison campus, filed suit in the

United States District Court for the Western District of Wisconsin against members of the board of regents. Respondents alleged, *inter alia*, that imposition of the segregated fee violated their rights of free speech, free association, and free exercise under the First Amendment. They contended the University must grant them the choice not to fund those RSO's that engage in political and ideological expression offensive to their personal beliefs. Respondents requested both injunctive and declaratory relief. On cross-motions for summary judgment, the District Court ruled in their favor, declaring the University's segregated fee program invalid under *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), and *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990). The District Court decided the fee program compelled students "to support political and ideological activity with which they disagree" in violation of respondents' First Amendment rights to freedom of speech and association. App. to Pet. for Cert. 98a. The court did not reach respondents' free exercise claim. The District Court's order enjoined the board of regents from using segregated fees to fund any RSO engaging in political or ideological speech.

The United States Court of Appeals for the Seventh Circuit affirmed in part, reversed in part, and vacated in part. *Southworth* v. *Grebe*, 151 F. 3d 717 (1998). As the District Court had done, the Court of Appeals found our compelled speech precedents controlling. After examining the University's fee program under the three-part test outlined in *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507 (1991), it concluded that the program was not germane to the University's mission, did not further a vital policy of the University, and imposed too much of a burden on respondents' free speech rights. "[L]ike the objecting union members in *Abood*," the Court of Appeals reasoned, the students here have a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with their own personal beliefs. 151 F. 3d, at 731. It added that

protecting the objecting students' free speech rights was "of heightened concern" following our decision in *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), because "[i]f the university cannot discriminate in the disbursement of funds, it is imperative that students not be compelled to fund organizations which engage in political and ideological activities—that is the only way to protect the individual's rights." 151 F. 3d, at 730, n. 11. The Court of Appeals extended the District Court's order and enjoined the board of regents from requiring objecting students to pay that portion of the fee used to fund RSO's engaged in political or ideological expression. *Id.*, at 735.

Three members of the Court of Appeals dissented from the denial of the University's motion for rehearing en banc. In their view, the panel opinion overlooked the "crucial difference between a requirement to pay money to an organization that explicitly aims to subsidize one viewpoint to the exclusion of other viewpoints, as in *Abood* and *Keller*, and a requirement to pay a fee to a group that creates a viewpoint-neutral forum, as is true of the student activity fee here." *Southworth* v. *Grebe*, 157 F. 3d 1124, 1129 (CA7 1998) (D. Wood, J., dissenting).

Other courts addressing First Amendment challenges to similar student fee programs have reached conflicting results. Compare *Rounds* v. *Oregon State Bd. of Higher Ed.*, 166 F. 3d 1032, 1038–1040 (CA9 1999); *Hays County Guardian* v. *Supple*, 969 F. 2d 111, 123 (CA5 1992), cert. denied, 506 U. S. 1087 (1993); *Kania* v. *Fordham*, 702 F. 2d 475, 480 (CA4 1983); *Good* v. *Associated Students of Univ. of Wash.*, 86 Wash. 2d 94, 105, 542 P. 2d 762, 769 (1975) (en banc), with *Smith* v. *Regents of Univ. of Cal.*, 4 Cal. 4th 843, 862–863, 844 P. 2d 500, 513–514, cert. denied, 510 U. S. 863 (1993). These conflicts, together with the importance of the issue presented, led us to grant certiorari. 526 U. S. 1038 (1999). We reverse the judgment of the Court of Appeals.

## II

It is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies. See, e. g., *Rust* v. *Sullivan*, 500 U. S. 173 (1991); *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 548–549 (1983). The case we decide here, however, does not raise the issue of the government's right, or, to be more specific, the state-controlled University's right, to use its own funds to advance a particular message. The University's whole justification for fostering the challenged expression is that it springs from the initiative of the students, who alone give it purpose and content in the course of their extracurricular endeavors.

The University having disclaimed that the speech is its own, we do not reach the question whether traditional political controls to ensure responsible government action would be sufficient to overcome First Amendment objections and to allow the challenged program under the principle that the government can speak for itself. If the challenged speech here were financed by tuition dollars and the University and its officials were responsible for its content, the case might be evaluated on the premise that the government itself is the speaker. That is not the case before us.

The University of Wisconsin exacts the fee at issue for the sole purpose of facilitating the free and open exchange of ideas by, and among, its students. We conclude the objecting students may insist upon certain safeguards with respect to the expressive activities which they are required to support. Our public forum cases are instructive here by close

analogy. This is true even though the student activities fund is not a public forum in the traditional sense of the term and despite the circumstance that those cases most often involve a demand for access, not a claim to be exempt from supporting speech. See, *e. g.*, *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993); *Widmar* v. *Vincent*, 454 U. S. 263 (1981). The standard of viewpoint neutrality found in the public forum cases provides the standard we find controlling. We decide that the viewpoint neutrality requirement of the University program is in general sufficient to protect the rights of the objecting students. The student referendum aspect of the program for funding speech and expressive activities, however, appears to be inconsistent with the viewpoint neutrality requirement.

We must begin by recognizing that the complaining students are being required to pay fees which are subsidies for speech they find objectionable, even offensive. The *Abood* and *Keller* cases, then, provide the beginning point for our analysis. *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977); *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990). While those precedents identify the interests of the protesting students, the means of implementing First Amendment protections adopted in those decisions are neither applicable nor workable in the context of extracurricular student speech at a university.

In *Abood,* some nonunion public school teachers challenged an agreement requiring them, as a condition of their employment, to pay a service fee equal in amount to union dues. 431 U. S., at 211–212. The objecting teachers alleged that the union's use of their fees to engage in political speech violated their freedom of association guaranteed by the First and Fourteenth Amendments. *Id.*, at 213. The Court agreed and held that any objecting teacher could "prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining repre-

sentative." *Id.*, at 234. The principles outlined in *Abood* provided the foundation for our later decision in *Keller*. There we held that lawyers admitted to practice in California could be required to join a state bar association and to fund activities "germane" to the association's mission of "regulating the legal profession and improving the quality of legal services." 496 U. S., at 13–14. The lawyers could not, however, be required to fund the bar association's own political expression. *Id.*, at 16.

The proposition that students who attend the University cannot be required to pay subsidies for the speech of other students without some First Amendment protection follows from the *Abood* and *Keller* cases. Students enroll in public universities to seek fulfillment of their personal aspirations and of their own potential. If the University conditions the opportunity to receive a college education, an opportunity comparable in importance to joining a labor union or bar association, on an agreement to support objectionable, extracurricular expression by other students, the rights acknowledged in *Abood* and *Keller* become implicated. It infringes on the speech and beliefs of the individual to be required, by this mandatory student activity fee program, to pay subsidies for the objectionable speech of others without any recognition of the State's corresponding duty to him or her. Yet recognition must be given as well to the important and substantial purposes of the University, which seeks to facilitate a wide range of speech.

In *Abood* and *Keller*, the constitutional rule took the form of limiting the required subsidy to speech germane to the purposes of the union or bar association. The standard of germane speech as applied to student speech at a university is unworkable, however, and gives insufficient protection both to the objecting students and to the University program itself. Even in the context of a labor union, whose functions are, or so we might have thought, well known and understood by the law and the courts after a long history of gov-

ernment regulation and judicial involvement, we have encountered difficulties in deciding what is germane and what is not. The difficulty manifested itself in our decision in *Lehnert* v. *Ferris Faculty Assn.,* 500 U. S. 507 (1991), where different Members of the Court reached varying conclusions regarding what expressive activity was or was not germane to the mission of the association. If it is difficult to define germane speech with ease or precision where a union or bar association is the party, the standard becomes all the more unmanageable in the public university setting, particularly where the State undertakes to stimulate the whole universe of speech and ideas.

The speech the University seeks to encourage in the program before us is distinguished not by discernable limits but by its vast, unexplored bounds. To insist upon asking what speech is germane would be contrary to the very goal the University seeks to pursue. It is not for the Court to say what is or is not germane to the ideas to be pursued in an institution of higher learning.

Just as the vast extent of permitted expression makes the test of germane speech inappropriate for intervention, so too does it underscore the high potential for intrusion on the First Amendment rights of the objecting students. It is all but inevitable that the fees will result in subsidies to speech which some students find objectionable and offensive to their personal beliefs. If the standard of germane speech is inapplicable, then, it might be argued the remedy is to allow each student to list those causes which he or she will or will not support. If a university decided that its students' First Amendment interests were better protected by some type of optional or refund system it would be free to do so. We decline to impose a system of that sort as a constitutional requirement, however. The restriction could be so disruptive and expensive that the program to support extracurricular speech would be ineffective. The First Amendment does not require the University to put the program at risk.

The University may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall. If the University reaches this conclusion, it is entitled to impose a mandatory fee to sustain an open dialogue to these ends.

The University must provide some protection to its students' First Amendment interests, however. The proper measure, and the principal standard of protection for objecting students, we conclude, is the requirement of viewpoint neutrality in the allocation of funding support. Viewpoint neutrality was the obligation to which we gave substance in *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995). There the University of Virginia feared that any association with a student newspaper advancing religious viewpoints would violate the Establishment Clause. We rejected the argument, holding that the school's adherence to a rule of viewpoint neutrality in administering its student fee program would prevent "any mistaken impression that the student newspapers speak for the University." *Id.*, at 841. While *Rosenberger* was concerned with the rights a student has to use an extracurricular speech program already in place, today's case considers the antecedent question, acknowledged but unresolved in *Rosenberger*: whether a public university may require its students to pay a fee which creates the mechanism for the extracurricular speech in the first instance. When a university requires its students to pay fees to support the extracurricular speech of other students, all in the interest of open discussion, it may not prefer some viewpoints to others. There is symmetry then in our holding here and in *Rosenberger*: Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected. We conclude that the University of Wisconsin may sustain

the extracurricular dimensions of its programs by using mandatory student fees with viewpoint neutrality as the operational principle.

The parties have stipulated that the program the University has developed to stimulate extracurricular student expression respects the principle of viewpoint neutrality. If the stipulation is to continue to control the case, the University's program in its basic structure must be found consistent with the First Amendment.

We make no distinction between campus activities and the off-campus expressive activities of objectionable RSO's. Those activities, respondents tell us, often bear no relationship to the University's reason for imposing the segregated fee in the first instance, to foster vibrant campus debate among students. If the University shares those concerns, it is free to enact viewpoint neutral rules restricting off-campus travel or other expenditures by RSO's, for it may create what is tantamount to a limited public forum if the principles of viewpoint neutrality are respected. Cf. *id.*, at 829–830. We find no principled way, however, to impose upon the University, as a constitutional matter, a requirement to adopt geographic or spatial restrictions as a condition for RSOs' entitlement to reimbursement. Universities possess significant interests in encouraging students to take advantage of the social, civic, cultural, and religious opportunities available in surrounding communities and throughout the country. Universities, like all of society, are finding that traditional conceptions of territorial boundaries are difficult to insist upon in an age marked by revolutionary changes in communications, information transfer, and the means of discourse. If the rule of viewpoint neutrality is respected, our holding affords the University latitude to adjust its extracurricular student speech program to accommodate these advances and opportunities.

Our decision ought not to be taken to imply that in other instances the University, its agents or employees, or—of

particular importance—its faculty, are subject to the First Amendment analysis which controls in this case. Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different. See *Rust* v. *Sullivan*, 500 U. S. 173 (1991); *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540 (1983). The Court has not held, or suggested, that when the government speaks the rules we have discussed come into play.

When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position. In the instant case, the speech is not that of the University or its agents. It is not, furthermore, speech by an instructor or a professor in the academic context, where principles applicable to government speech would have to be considered. Cf. *Rosenberger, supra*, at 833 (discussing the discretion universities possess in deciding matters relating to their educational mission).

### III

It remains to discuss the referendum aspect of the University's program. While the record is not well developed on the point, it appears that by majority vote of the student body a given RSO may be funded or defunded. It is unclear to us what protection, if any, there is for viewpoint neutrality in this part of the process. To the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requires. The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent. That principle is controlling here. A remand is necessary and appropriate to

resolve this point; and the case in all events must be reexamined in light of the principles we have discussed.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion. In this Court, the parties shall bear their own costs.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE BREYER join, concurring in the judgment.

The majority today validates the University's student activity fee after recognizing a new category of First Amendment interests and a new standard of viewpoint neutrality protection. I agree that the University's scheme is permissible, but do not believe that the Court should take the occasion to impose a cast-iron viewpoint neutrality requirement to uphold it. See *ante*, at 233–234. Instead, I would hold that the First Amendment interest claimed by the student respondents (hereinafter Southworth) here is simply insufficient to merit protection by anything more than the viewpoint neutrality already accorded by the University, and I would go no further.[1]

The parties have stipulated that the grant scheme is administered on a viewpoint neutral basis, and like the majority I take the case on that assumption. The question before us is thus properly cast not as whether viewpoint neutrality is required, but whether Southworth has a claim to relief from this specific viewpoint neutral scheme.[2] Two sources of law might be considered in answering this question.

---

[1] I limit my examination of the case solely to the general disbursement scheme; I agree with the majority that the referendum issue was not adequately addressed in the District Court and the Court of Appeals, see *ante*, at 235 and this page, and I would say nothing more on that subject.

[2] Under its own reasoning, the majority need not reach the question whether viewpoint neutrality is required to decide this case. The University program required viewpoint neutrality, and both parties have stipulated that the funds are disbursed accordingly. Stipulation 12, App. 14–

The first comprises First Amendment and related cases grouped under the umbrella of academic freedom.[3] Such law might be implicated by the University's proffered rationale, that the grant scheme funded by the student activity fee is an integral element in the discharge of its educational mission. App. 253 (excerpt from Dean of Students Office Student Organization Handbook noting that the activities of student groups constitute a "'second curriculum'"); *id.,* at 41, 42–44 (statement of Associate Dean of Students of the UW-Madison noting academic importance of funding scheme); see also *ante,* at 233. Our understanding of academic freedom has included not merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach. In *Regents of Univ. of Mich.* v. *Ewing,* 474 U. S. 214 (1985), we recognized these related conceptions: "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." *Id.,* at 226, n. 12 (citations omitted). Some of the opinions in our books emphasize broad conceptions of academic freedom that if accepted by the Court might seem to clothe the University with an immunity to any challenge to regulations made or obligations imposed in the discharge of its educational mission. So, in *Sweezy* v. *New Hampshire,* 354 U. S. 234 (1957), Justice Frankfurter, concurring in the result and joined by Justice Harlan, explained the

---

15. If viewpoint neutrality is a sufficient condition, the majority could uphold the scheme here on that limited ground without deciding whether it is a necessary one.

[3] We have long recognized the constitutional importance of academic freedom. See *Wieman* v. *Updegraff,* 344 U. S. 183, 195 (1952) (Frankfurter, J., concurring); *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957) (plurality opinion); *Shelton* v. *Tucker,* 364 U. S. 479, 487 (1960); *Keyishian* v. *Board of Regents of Univ. of State of N. Y.,* 385 U. S. 589, 603 (1967).

importance of a university's ability to define its own mission by quoting from a statement on the open universities in South Africa:

> " 'It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " *Id.*, at 263 (citations omitted).

These broad statements on academic freedom do not dispose of the case here, however. *Ewing* addressed not the relationship between academic freedom and First Amendment burdens imposed by a university, but a due process challenge to a university's academic decisions, while as to them the case stopped short of recognizing absolute autonomy. *Ewing, supra,* at 226, and n. 12. And Justice Frankfurter's discussion in *Sweezy,* though not rejected, was not adopted by the full Court, *Sweezy, supra,* at 263 (opinion concurring in result). Our other cases on academic freedom thus far have dealt with more limited subjects, and do not compel the conclusion that the objecting university student is without a First Amendment claim here.[4] While we have spoken in terms of a wide protection for the academic free-

---

[4] Our university cases have dealt with restrictions imposed from outside the academy on individual teachers' speech or associations, *id.*, at 591–592; *Shelton* v. *Tucker, supra,* at 487; *Sweezy* v. *New Hampshire, supra,* at 236; *Wieman* v. *Updegraff, supra,* at 184–185, and cases dealing with the right of teaching institutions to limit expressive freedom of students have been confined to high schools, *Hazelwood School Dist.* v. *Kuhlmeier,* 484 U. S. 260, 262 (1988); *Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675, 677 (1986); *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 504 (1969), whose students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college education.

dom and autonomy that bars legislatures (and courts) from imposing conditions on the spectrum of subjects taught and viewpoints expressed in college teaching (as the majority recognizes, *ante*, at 232), we have never held that universities lie entirely beyond the reach of students' First Amendment rights.[5] Thus our prior cases do not go so far as to control the result in this one, and going beyond those cases would be out of order, simply because the University has not litigated on grounds of academic freedom. As to that freedom and university autonomy, then, it is enough to say that protecting a university's discretion to shape its educational mission may prove to be an important consideration in First Amendment analysis of objections to student fees. *Sweezy, supra*, at 262–264 (Frankfurter, J., concurring in result); *Ewing, supra*, at 226, n. 12.

The second avenue for addressing Southworth's claim to a pro rata refund or the total abolition of the student activity fee is to see how closely the circumstances here resemble instances of governmental speech mandates found to require relief. As a threshold matter, it is plain that this case falls far afield of those involving compelled or controlled speech, apart from subsidy schemes. Indirectly transmitting a fraction of a student activity fee to an organization with an offensive message is in no sense equivalent to restricting or modifying the message a student wishes to express. Cf. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 572–574 (1995). Nor does it require an individual to bear an offensive statement personally, as in *Wooley* v. *Maynard*, 430 U. S. 705, 707 (1977), let alone to affirm a moral or political commitment, as in *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 626–629 (1943). In each of these cases, the government was imposing far more directly and offensively on an objecting individual than col-

---

[5] Indeed, acceptance of the most general statement of academic freedom (as in the South African manifesto quoted by Justice Frankfurter) might be thought even to sanction student speech codes in public universities.

lecting the fee that indirectly funds the jumble of other speakers' messages in this case.

Next, I agree with the majority that the *Abood* and *Keller* line of cases does not control the remedy here, the situation of the students being significantly different from that of union or bar association members. *Ante*, at 230; see *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977); *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990). First, the relationship between the fee payer and the ultimately objectionable expression is far more attenuated. In the union and bar association cases, an individual was required to join or at least drop money in the coffers of the very organization promoting messages subject to objection. *Abood, supra*, at 211–213, 215; *Keller, supra*, at 13–14. The connection between the forced contributor and the ultimate message was as direct as the unmediated contribution to the organization doing the speaking. The student contributor, however, has to fund only a distributing agency having itself no social, political, or ideological character and itself engaging (as all parties agree) in no expression of any distinct message.[6] App. 14–15, 34, 39, 41. Indeed, the disbursements, varying from year to year, are as likely as not to fund an organization that disputes the very message an individual student finds exceptionable. *Id.*, at 39. Thus, the clear connection between fee payer and offensive speech that loomed large in our decisions in the union and bar cases is simply not evident here.

Second, Southworth's objection has less force than it might otherwise carry because the challenged fees support a gov-

---

[6] I have noted in other contexts that the act of funding itself may have a communicative element, see *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 892–893, n. 11 (1995) (dissenting opinion); *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 611, n. 6 (1998) (dissenting opinion), but there is no allegation that such general expression is objectionable here, nor is it clear that such a claim necessarily raises substantial First Amendment concerns in light of the speech promoting and educational aspects of this expression. Cf. *Buckley* v. *Valeo*, 424 U. S. 1, 92–93 (1976) *(per curiam)*. See also *infra* this page and 241–243.

ernment program that aims to broaden public discourse. As I noted in *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 873–874, and n. 3, 889–891 (1995) (dissenting opinion), the university fee at issue is a tax.[7] The state university compels it; it is paid into state accounts; and it is disbursed under the ultimate authority of the State. Wis. Stat. § 36.09(5) (1993–1994); App. 9, 18–19. Although the facts here may not fit neatly under our holdings on government speech (and the University has expressly renounced any such claim),[8] *ante*, at 229, our cases do suggest that under the First Amendment the government may properly use its tax revenue to promote general discourse.[9] In *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, we rejected a challenge to a congressional program providing viewpoint neutral subsidies to all Presidential candidates based in part on this reasoning:

> "[The program] is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people. Thus, [the program] furthers, not abridges, pertinent First Amendment values." *Id.*, at 92–93 (footnotes omitted).

---

[7] True, one does not have to go to college, but one does not have to own real estate or receive a dividend.

[8] Unlike the majority, I would not hold that the mere fact that the University disclaims speech as its own expression takes it out of the scope of our jurisprudence on government directed speech. We have never generally questioned a university's "spacious discretion" to allocate public funds. See *Rosenberger, supra*, at 892 (SOUTER, J., dissenting) (citing *Rust* v. *Sullivan*, 500 U. S. 173 (1991), and *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540 (1983)).

[9] Of course, I believe that even a government program that promotes a broad range of expression is subject to the specific prohibition on government funding to promote religion, imposed by the Establishment Clause. See *Rosenberger, supra*, at 882 (SOUTER, J., dissenting).

And we have recognized the same principle outside of the sphere of government spending as well. In *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), we rejected a shopping mall owner's blanket claim that "a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others." *Id.*, at 85 (footnote omitted). We then upheld the right of individuals to exercise state-protected rights of expression on a shopping mall owner's property, noting among other things that there was no danger that such a requirement would "'dampe[n] the vigor and limi[t] the variety of public debate.'" *Id.*, at 87, 88 (quoting *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 257 (1974) (alteration in original)). The same consideration goes against the fee payer's speech objection to the scheme here.

Third, our prior compelled speech and compelled funding cases are distinguishable on the basis of the legitimacy of governmental interest. No one disputes the University's assertion that some educational value is derived from the activities supported by the fee, *ante*, at 232–233; *supra*, at 237, whereas there was no governmental interest in mandating union or bar association support beyond supporting the collective bargaining and professional regulatory functions of those organizations, see *Abood, supra*, at 223–224; *Keller, supra*, at 13–14. Nor was there any legitimate governmental interest in requiring the publication or affirmation of propositions with which the bearer or speaker did not agree.[10] *Wooley*, 430 U. S., at 716–717; *Barnette*, 319 U. S., at 640–642.

Finally, the weakness of Southworth's claim is underscored by its setting within a university, whose students are inevitably required to support the expression of personally

---

[10] The legitimacy of the governmental objective here distinguishes the case in my view from one brought by a university student who objected to supporting religious evangelism. See *Rosenberger, supra*, at 868–871 (SOUTER, J., dissenting).

offensive viewpoints in ways that cannot be thought constitutionally objectionable unless one is prepared to deny the University its choice over what to teach. No one disputes that some fraction of students' tuition payments may be used for course offerings that are ideologically offensive to some students, and for paying professors who say things in the university forum that are radically at odds with the politics of particular students. Least of all does anyone claim that the University is somehow required to offer a spectrum of courses to satisfy a viewpoint neutrality requirement. See *Rosenberger, supra,* at 892–893, and nn. 11–12 (SOUTER, J., dissenting). The University need not provide junior years abroad in North Korea as well as France, instruct in the theory of plutocracy as well as democracy, or teach Nietzsche as well as St. Thomas. Since uses of tuition payments (not optional for anyone who wishes to stay in college) may fund offensive speech far more obviously than the student activity fee does, it is difficult to see how the activity fee could present a stronger argument for a refund.

In sum, I see no basis to provide relief from the scheme being administered, would go no further, and respectfully concur in the judgment.