Justice Kennedy,
concurring.
To be effective, a limited forum often will exclude some speakers based on their affiliation (e. g., student versus non-student) or based on the content of their speech, interests, and expertise (e. g., art professor not chosen as speaker for conference on public transit). When the government does exclude from a limited forum, however, other content-based judgments may be impermissible. For instance, an otherwise qualified and relevant speaker may not be excluded because of hostility to his or her views or beliefs. See Healy v. James, 408 U. S. 169, 187-188 (1972).
In Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819 (1995), the essential purpose of the limited forum was to facilitate the expression of differing views in the context of student publications. The forum was limited because it was confined: first, to student-run groups; and second, to publications. The forum was created in the long tradition of using newspapers and other publications to express differing views and also in the honored tradition of a university setting that stimulates the free exchange of ideas. See id., at 835 (“[I]n the University setting, . . . the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition”). These considerations supported the Court’s conclusion that, under the First Amendment, a limited forum for student-run publications did not permit the exclusion of a paper for the reason that it was devoted to expressing religious views.
Rosenberger is distinguishable from the instant case in various respects. Not least is that here the school policy in question is not content based either in its formulation or evi *704 dent purpose; and were it shown to be otherwise, the case likely should have a different outcome. Here, the policy applies equally to all groups and views. And, given the stipulation of the parties, there is no basis for an allegation that the design or purpose of the rule was, by subterfuge, to discriminate based on viewpoint.
An objection might be that the all-comers policy, even if not so designed or intended, in fact makes it difficult for certain groups to express their views in a manner essential to their message. A group that can limit membership to those who agree in full with its aims and purposes may be more effective in delivering its message or farthering its expressive objectives; and the Court has recognized that this interest can be protected against governmental interference or regulation. See Boy Scouts of America v. Dale, 530 U. S. 640 (2000). By allowing like-minded students to form groups around shared identities, a school creates room for self-expression and personal development. See Board of Regents of Univ. of Wis. System v. Southworth, 529 U. S. 217, 229 (2000) (“The University’s whole justification for [its student activity program] is that it springs from the initiative of the students, who alone give it purpose and content in the course of their extracurricular endeavors”).
In the instant case, however, if the membership qualification were enforced, it would contradict a legitimate purpose for having created the limited forum in the first place. Many educational institutions, including respondent Hastings College of the Law, have recognized that the process of learning occurs both formally in a classroom setting and informally outside of it. See id., at 233. Students may be shaped as profoundly by their peers as by their teachers. Extracurricular activities, such as those in the Hastings “Registered Student Organization” program, facilitate interactions between students, enabling them to explore new points of view, to develop interests and talents, and to nurture a growing sense of self. See Board of Ed. of Independ *705 ent School Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U. S. 822, 831, n. 4 (2002) (participation in extracurricular activities is “‘a significant contributor to the breadth and quality of the educational experience’ ”). The Hastings program is designed to allow all students to interact with their colleagues across a broad, seemingly unlimited range of ideas, views, and activities. See Regents of Univ. of Cal. v. Bakke, 438 U. S. 265, 312, 313, n. 48 (1978) (opinion of Powell, J.) (“[A] great deal of learning... occurs through interactions among students . . . who have a wide variety of interests, talents, and perspectives; and who are able, directly or indirectly, to learn from their differences and to stimulate one another to reexamine even their most deeply held assumptions about themselves and their world” (alteration in original; internal quotation marks omitted)).
Law students come from many backgrounds and have but three years to meet each other and develop their skills. They do so by participating in a community that teaches them how to create arguments in a convincing, rational, and respectful manner and to express doubt and disagreement in a professional way. A law school furthers these objectives by allowing broad diversity in registered student organizations. But these objectives may be better achieved if students can act cooperatively to learn from and teach each other through interactions in social and intellectual contexts. A vibrant dialogue is not possible if students wall themselves off from opposing points of view.
The school’s objectives thus might not be well served if, as a condition to membership or participation in a group, students were required to avow particular personal beliefs or to disclose private, off-campus behavior. Students whose views are in the minority at the school would likely fare worse in that regime. Indeed, were those sorts of requirements to become prevalent, it might undermine the principle that in a university community — and in a law school community specifically — speech is deemed persuasive based on its *706 substance, not the identity of the speaker. The era of loyalty oaths is behind us. A school quite properly may conclude that allowing an oath or belief-affirming requirement, or an outside conduct requirement, could be divisive for student relations and inconsistent with the basic concept that a view’s validity should be tested through free and open discussion. The school’s policy therefore represents a permissible effort to preserve the value of its forum.
In addition to a circumstance, already noted, in which it could be demonstrated that a school has adopted or enforced its policy with the intent or purpose of discriminating or disadvantaging a group on account of its views, petitioner also would have a substantial case on the merits if it were shown that the all-comers policy was either designed or used to infiltrate the group or challenge its leadership in order to stifle its views. But that has not been shown to be so likely or self-evident as a matter of group dynamics in this setting that the Court can declare the school policy void without more facts; and if there were a showing that in a particular case the purpose or effect of the policy was to stifle speech or make it ineffective, that, too, would present a case different from the one before us.
These observations are offered to support the analysis set forth in the opinion of the Court, which I join.