

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JUL 1 1 2019

Fairhurst, CJ

CHIEF JUSTICE

This opinion was
filed for record
at 8:00 on 7-11-19

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MARK ELSTER and SARAH PYNCHON | ) ) ) | |
| Appellants, | ) ) | No. 96660-5 |
| v. | ) ) | |
| THE CITY OF SEATTLE, | ) ) ) | En Banc |
| Respondent. | ) ) | Filed    JUL 1 1 2019 |

GONZÁLEZ, J.—Seattle voters approved the "Democracy Voucher Program," intending to increase civic engagement. Under this program, the city provides vouchers to registered municipal voters and qualifying residents. Recipients can give their vouchers to qualified municipal candidates, who then may redeem them for campaign purposes. The city funds the program from property taxes. Mark Elster and Sarah Pynchon sued in King County Superior Court, arguing the taxes funding the program burden First Amendment rights and unconstitutionally compel speech. U.S.

1

CONST. amend. I. The superior court dismissed the suit. Because the program does not violate the First Amendment, we affirm.

FACTS

In 2015, Seattle voters approved Initiative 122, establishing the Democracy Voucher Program. According to the initiative, the program's purposes are (1) to "expand the pool of candidates for city offices and to safeguard the people's control of the elections process," (2) to "ensure the people of Seattle have equal opportunity to participate in political campaigns and be heard by candidates," and (3) to "prevent corruption." Clerk's Papers at 14, 16.

The Democracy Voucher Program attempts to further these goals by providing vouchers to eligible municipal residents for use in city elections.[1] Voter registration in Seattle makes one automatically eligible to receive vouchers; municipal residents who can donate to a political campaign under federal law can also receive vouchers. A voter-approved, 10-year property tax funds the program, collecting in 2016 "approximately $0.0194/$1000 assessed value" in additional property taxes. *Id.* at 57. The voucher recipients can give their vouchers to qualified municipal candidates.

---

[1] To be eligible to receive vouchers from municipal residents, municipal candidates must obtain a required number of signatures and contributions from qualified municipal residents.

Elster and Pynchon own property in Seattle. They brought a 42 U.S.C § 1983 action challenging the constitutionality of the Democracy Voucher Program, arguing it is unconstitutional to use tax dollars to underwrite campaign contributions.

Instead of answering Elster and Pynchon's complaint, the city moved to dismiss. The superior court granted the city's motion, upholding the Democracy Voucher Program. It found that the city "articulated a reasonable justification" for the program that was consistent with United States Supreme Court precedent: "an increase in voter participation in the electoral process." *Id.* at 115. Elster and Pynchon appealed, and the Court of Appeals certified the case to us.

STANDARD OF SCRUTINY

Elster and Pynchon challenge the city's use of tax revenue to fund political speech. "[T]he central purpose of the [First Amendment is] to assure a society in which 'uninhibited, robust, and wide-open' public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish." *Buckley v. Valeo*, 424 U.S. 1, 93 n.127, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).

If the Democracy Voucher Program does not burden fundamental rights, the program enjoys the presumption of constitutionality and the challengers bear the heavy burden of showing the city lacked the power to impose the tax under rational basis scrutiny. *See Forbes v. City of Seattle*, 113 Wn.2d 929, 941, 785 P.2d 431 (1990) (upholding theater ticket admission tax against First Amendment and equal protection challenges (citing *Fin. Pac. Leasing, Inc. v. City of Tacoma*, 113 Wn.2d 143, 147, 776 P.2d 136 (1989))). The power to tax is a fundamental, necessary sovereign power of government. *Love v. King County*, 181 Wash. 462, 467, 44 P.2d 175 (1935). "The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties." *Bd. of Regents v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 146 L. Ed. 2d 193 (2000). If rational basis scrutiny applies, the program's tax need only rationally relate to a legitimate government interest. *See Dot Foods, Inc. v. Dep't of Revenue*, 185 Wn.2d 239, 249, 372 P.3d 747 (2016).

Elster and Pynchon ask us to apply strict scrutiny, alleging the Democracy Voucher Program burdens fundamental rights. If the program burdens fundamental rights, strict scrutiny applies; to survive strict scrutiny, the city needs to show the program furthers a compelling interest and is narrowly tailored to achieve that interest. *Citizens United v. Fed. Election*

*Comm'n*, 558 U.S. 310, 340, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010)

("Premised on mistrust of governmental power, the First Amendment stands

against attempts to disfavor certain subjects or viewpoints."); *see also*

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.

Ct. 2510, 132 L. Ed. 2d 700 (1995) (viewpoint neutrality requires the

government to "abstain from regulating speech when the specific motivating

ideology or the opinion or perspective of the speaker is the rationale for the

restriction"). As will be discussed below in the context of Elster and

Pynchon's substantive arguments, heightened scrutiny does not apply.

Accordingly, we apply rational basis review.

ANALYSIS

Elster and Pynchon assert the Democracy Voucher Program, *through

its tax*, unconstitutionally compels them to support the program's message.

Neither this court nor the United States Supreme Court has squarely

addressed the issue before us: whether a tax used to fund a public financing

system violates First Amendment rights. Elster and Pynchon do not assert a

violation of the state constitution. Most related cases have addressed

challenges to the public financing systems themselves, not the potential

injury to the taxpayers funding those systems. *See, e.g., Buckley*, 424 U.S. at

5

92-93; *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011).

In *Buckley*, the Court upheld the public financing of elections, in the context of a system where taxpayers elect to authorize payment from their taxes to the Presidential Election Campaign Fund. The Court held public financing of elections "is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." 424 U.S. at 92-93. The Court concluded that the public financing system was constitutional despite the fact it amounted to the disbursement of tax revenue to political parties; the Court found that "every appropriation made by Congress uses public money in a manner to which some taxpayers object." *Id.* at 92.

Public financing schemes must not burden freedom of speech and they are presumptively unconstitutional if they do. For example, in *Bennett*, the Court declared unconstitutional an Arizona system that provided matching funds to publicly financed candidates, if those candidates agreed to certain campaign restrictions, after their opponents privately raised or spent funds beyond a threshold amount. 564 U.S. at 747. The Arizona system operated in a way that burdened the speech of both privately financed candidates and

groups independently advocating for those candidates. The matching funds penalized privately financed candidates who "'robustly'" exercised their First Amendment rights, by providing funds to their political rivals. *Id.* at 736 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008)). The Court found the matching funds "particularly burdensome" on independent groups because their choices were to "trigger matching funds, change your message, or do not speak." *Id.* at 739. The Court distinguished its holding in *Buckley*—that public financing systems are constitutional—from cases in which the speech of some is increased "at the expense of impermissibly burdening (and thus reducing) the speech" of others. *Id.* at 741.

Elster and Pynchon argue the Democracy Voucher Program is not viewpoint neutral because the vouchers will be distributed among qualified municipal candidates unevenly and according to majoritarian preferences. "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Southworth*, 529 U.S. at 235. Here, the decision of who receives vouchers is left to the individual municipal resident and is not dictated by the city or subject to referendum. Elster and Pynchon do not dispute that the city imposes neutral criteria on who can receive vouchers and who can redeem them, making the program's

administration viewpoint neutral. That some candidates will receive more vouchers reflects the inherently majoritarian nature of democracy and elections, not the city's intent to subvert minority views.

The tax at issue here does not alter, abridge, restrict, censor, or burden speech. On the contrary, the Democracy Voucher Program "facilitate[s] and enlarge[s] public discussion and participation in the electoral process." *Buckley*, 424 U.S. at 92-93. The program resembles other content neutral ways the government facilitates political speech, for example, when the government distributes voters' pamphlets. *See, e.g.*, RCW 29A.32.010 (concerning distribution of voters' pamphlets for the general election); *see also* LAWS OF 2013, chs. 143, 195 (ensuring contested judicial races and other nonpartisan races are not decided at the primary).[2] Thus, wholly distinct from cases involving unconstitutional campaign finance laws and

---

[2] The lack of a primary voter's pamphlet for statewide races in most counties was one of the concerns that drove the legislature to move these races to the general election. *See* S.B. REP. ON H.B. 1474, at 2, 63d Leg., Reg. Sess. (Wash. 2013).

Another recent example of governmental facilitation of political speech is when the State allocated funds for prepaid postage election expenses. Letter from Jay Inslee, Governor of Washington State, to Kim Wyman, Washington Secretary of State (May 14, 2018), http://www.governor.wa.gov/sites/default/files/SOS%20Efund%20letter%20for% 20elections.pdf [https://perma.cc/A2P5-TDPU]; *cf. Burdick v. Takushi*, 504 U.S. 428, 438, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (the Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls" (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 199, 107 S. Ct. 533, 93 L. Ed. 2d 499 (1986))).

laws that discriminate based on content or viewpoint, the program does not burden freedom of speech, and strict scrutiny does not apply.[3]

Elster and Pynchon argue *Janus v. American Federation of State, County & Municipal Employees, Council 31*, __ U.S. __, 138 S. Ct. 2448, 201 L. Ed. 2d 924 (2018), renders the Democracy Voucher Program unconstitutional because they disagree with the program's message. In *Janus*, the Court held that the funding of the collective bargaining process through an agency fee of nonmember public sector employees "seriously impinges on First Amendment rights." *Id.* at 2464. The collective bargaining process compelled the nonmembers to "provide financial support for a union" that adopts powerful political positions the nonmembers oppose. *Id.*; *see also United States v. United Foods*, 533 U.S. 405, 415-16, 121 S. Ct. 2334, 150 L. Ed. 2d 438 (2001) (finding unconstitutional an assessment on mushroom handlers that funds the promotion of mushroom advertisements created by a council of industry representatives).

*Janus* involved an agency fee that directly subsidized the union's collective bargaining activities, which burdened "'associational freedoms.'"

---

[3] We disagree with Elster and Pynchon's contention in the alternative that *Buckley* requires heightened scrutiny under these facts. *Compare* 424 U.S. at 17-84 (applying heightened scrutiny to various campaign restrictions), *with id.* at 92-93 (not applying heightened scrutiny to the public financing scheme).

138 S. Ct. at 2466, 2468 (quoting *Harris v. Quinn*, 573 U.S. 616, 649, 134 S. Ct. 2618, 189 L. Ed. 2d 620 (2014)). Unlike the employees in *Janus*, Elster and Pynchon cannot show the tax individually associated them with any message conveyed by the Democracy Voucher Program.[4] Without such a showing, *Janus* has no bearing on this case and the program is not subject to heightened scrutiny. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980) (noting the First Amendment was not violated where "views expressed by members of the public . . . will not likely be identified with those of the owner"); *accord Southworth*, 529 U.S. at 233 (university's viewpoint neutral funding of student groups ensured student groups' activities did not burden objecting students' associational freedoms).

The Democracy Voucher Program's purpose is to, among other things, "giv[e] more people an opportunity to have their voices heard in democracy." SEATTLE MUNICIPAL CODE 2.04.600. The government has a legitimate interest in its public financing of elections, as *Buckley* held. *See* 424 U.S. at 92-93. The program's tax directly supports this interest. The program, therefore, survives rational basis scrutiny.

---

[4] The Democracy Voucher Program funds the speech of municipal residents and candidates. It does not fund government speech. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559, 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005).

CONCLUSION

The Democracy Voucher Program does not alter, abridge, restrict, censor, or burden speech. Nor does it force association between taxpayers and any message conveyed by the program. Thus, the program does not violate First Amendment rights. We affirm.

González, J.

WE CONCUR:

Fairhurst, C.J.

Stephens, J.

Johnson, J.

Wiggins, J.

Madsen, J.

Gordon McCloud, J.

Owens, J.

Yu, J.