**Scott H. SOUTHWORTH, Amy Schoepke and Keith Bannach, et al., Plaintiffs–Appellees, Cross–Appellants,**

v.

**Michael W. GREBE, Sheldon B. Lubar, Jonathan B. Barry, et al., Defendants–Appellants, Cross–Appellees.**

**Nos. 97–3510, 97–3548.**

United States Court of Appeals, Seventh Circuit.

Submitted Aug. 31, 1998.

Decided Oct. 27, 1998.

Jordan W. Lorence (submitted), Northstar Legal Center, Fairfax, VA, for Plaintiffs–Appellees, Cross–Appellants.

Susan K. Ullman, Office of the Attorney General, Wisconsin Dept. of Justice, Madison, WI, for Defendants–Appellants, Cross–Appellees in No. 97-3510.

James E. Doyle, Office of the Attorney General, Wisconsin Dept. of Justice, Madison, WI, for Defendants–Appellants, Cross–Appellees in No. 97-3548

David E. Wood, Fund for Public Interest Research, Inc., Madison, WI, for Amicus Curiae Wisconsin Student Public Interest Research Group, Inc.

Patricia M. Logue, Lambda Legal Defense and Education Fund, Chicago, IL, Ruth Harlow, Lambda Legal Defense and Education Fund, New York City, for Amicus Curiae The Lesbian, Gay and Bisexual Campus Center at the University of Wisconsin-Madison and Lambda Legal Defense & Education Fund, Inc.

Before POSNER, Chief Judge, and CUMMINGS, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD and EVANS, Circuit Judges.

## ON PETITION FOR REHEARING EN BANC

On consideration of the petition for rehearing with suggestion for rehearing en banc filed by defendants-appellants and the answer of the plaintiffs-appellees, all of the judges on the original panel voted to deny rehearing and a majority of the judges in active service voted to deny rehearing en banc. Judges Walter J. Cummings, Ilana Diamond Rovner, Diane P. Wood and Terence T. Evans voted to grant rehearing en banc. Judge Ilana Diamond Rovner dissented from the denial of rehearing en banc and filed an opinion which was joined by Judge Diane P. Wood and Judge Terence T. Evans. Judge Diane P. Wood dissented from the denial of rehearing en banc and filed an opinion which was joined by Judge Ilana Diamond Rovner and Judge Terence T. Evans.

The petition for rehearing is denied.

ROVNER, Circuit Judge, with whom DIANE P. WOOD and EVANS, Circuit Judges, join, dissenting from the denial of rehearing *en banc*.

This important First Amendment case merits the consideration of the full court. This panel's opinion conflicts with the holding of at least one other circuit, *see Carroll v. Blinken*, 957 F.2d 991 (2d Cir.1992) and *Carroll v. Blinken*, 42 F.3d 122 (2d Cir.1994), and, in my view, misapprehends Supreme Court precedent. Its effect is to impede the ability of public universities to fund student groups that represent a wide range of viewpoints. The resulting impact on the expression of ideas on campus would undermine the educational mission of those universities, and is not required by the First Amendment.

The panel opinion extends the prohibition against compelled speech to a new level, beyond what has been recognized by the Supreme Court. As the panel recognizes, the controlling Supreme Court cases are *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). In *Abood* and *Keller*, however, the recipients of the funds were themselves engaging in the challenged speech, either directly or indirectly. For instance, in *Abood*, the union used dues to fund ideological activities and support political candidates, and in *Keller*, the state bar used dues for lobbying activities. In contrast to those cases, however, the recipient of the funds in this case is not itself engaging in the challenged speech, nor is that speech even attributable to it. The complaining students are paying fees not to the challenged groups, but to the student government which then uses the money to fund its own operations and over 100 student groups, regardless of viewpoint. This distinction is significant, because the gravamen of the students' complaint is that they are being compelled to speak or to fund speech with which they disagree. The only direct "speech" of the student government, if any, is the promotion of the student government and a forum for student activities and views. The speech of the offending groups can hardly be attributed to the student government, which funds groups of radically different views (including the Federalist Society, of which some plaintiffs were members, and the International Socialist Organization). Indeed, the student government constitutionally must determine funding in a content-neutral manner. *See Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

This is no semantic difference. Numerous courts have recognized that the free expression of a wide range of ideas is central to the educational mission of a university, teaching students to think for themselves and to separate the "wheat from the chaff." The students concede that the funding arrangement is designed to create a public forum for free expression, a concept not objected to by plaintiffs. Inherent in a content-neutral forum, however, is the notion that the creators of the forum do not espouse the views of all speakers. Because the "speech" of the individual groups cannot be attributed to the student government, it necessarily cannot be attributed to the students paying the fees to the student government. Consider the payment of tuition which might support research or class topics with which a student might disagree. It is difficult to see how a student could successfully challenge funding to the socialist student group because it advocates socialism, but could not challenge the use of

tuition to fund the salary of a professor who publishes articles touting the merits of socialism. Just as the university is not endorsing the views of its professors, so too the student government is not espousing any particular political or ideological speech. Rather, it is supporting a forum for a wide range of expression. Therefore, there is no issue of "compelled speech" here because the funds are not used by the student government to engage in that speech.

This does not mean that the constitutionality of the funding scheme should depend upon whether the funding is direct or indirect, or that one can "launder" the funding by passing it through a neutral conduit. As *Abood* and *Keller* make clear, even indirect funding can raise constitutional problems. That is not, however, what is happening in this case. In *Abood* and *Keller*, the funds were used by the union and bar association to engage in political and ideological speech both directly and indirectly through private groups. The crucial point, however, is that the private groups were funded *because* of their political and ideological positions, and *for the purpose of furthering* those positions. Therefore, the speech presented by those groups was attributable to the union and bar association. They were engaged in political and ideological speech regardless of whether it emerged from their own groups or paid spokespersons for their views. In stark contrast, the student government has not aligned itself with any political or ideological viewpoint. It does not fund the groups because of their political or ideological speech, and no one even suggests that the speech engaged in by those groups can be attributed to the student government itself. If the student government is not itself "speaking," how can funds given to it constitute compelled speech? The chain of custody of the funds cannot itself be enough to raise a constitutional issue. Otherwise, the student government could not even order supplies from a company that contributes to political candidates, because the student government money used to purchase those supplies would be used to "fund" political speech. At a minimum, we must look to whether the immediate recipient of the funds (here, the student government) is itself engaged in any objectionable speech. If it is not, the inquiry should end.

Even if we assumed that speech by the secondary recipients of the funds could be attributed to the students, and thus be viewed as compelled speech, it does not follow that there is a constitutional violation. The panel applies a test developed for a different context and not suited to this case. Moreover, in contrast to the Supreme Court and Circuit cases concerning compelled speech, the panel fails to address each challenged expenditure individually, and analyze the proper balancing for each one. Instead, the panel declares that political and ideological speech as a whole is not germane to the educational mission. That holding flies in the face of numerous Supreme Court pronouncements regarding the importance of robust debate and free expression in a university setting. *See e.g. Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Widmar v. Vincent*, 454 U.S. 263, 278–80 & n. 2, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Moreover, the panel erroneously focuses on the motives of the individual groups receiving the funding, stating that the International Socialist Organization, for example, is only incidentally concerned with education and is primarily concerned with promotion of its ideological beliefs. That focus reverses the appropriate analysis. Our focus should be on the funding by the student government, and whether the expression of ideology by the student group promotes the educational mission, regardless of whether that was the intent of the group. Moreover, the reliance on *Galda v. Rutgers*, 772 F.2d 1060 (3d Cir. 1985), is misplaced here, because the fee in that case was targeted specifically for the objectionable group, not for a forum of all groups, and was granted for the purpose of funding the challenged group's objectives. Because there was a direct connection between the student government and the speech, an analysis of the educational objectives of that particular group was considered appropriate.

Finally, I submit that the potential interference with the speech interests of the stu-

dents in this case are overstated. This section of the opinion relies entirely on a part of *Lehnert v. Ferris Faculty Assoc.*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), which received the support of only four justices, and thus is not controlling. Moreover, the panel fails to recognize that the "burden on objecting student's speech" is lessened by the availability of the same funds to present opposing speech. In that way, this case is again fundamentally different from *Abood* and *Keller*. In *Abood*, the union was the sole determinant of the speech. Similarly, in *Keller*, the bar association that received funds controlled the speech. In the present case, however, the activity fees are available to myriad student groups. The recipients of the fees do not have a monopoly on the fees, and therefore the dues support multiple viewpoints. Indeed, the objectors could presumably form their own student group and receive funds for the expression of a contrary viewpoint, and some belong to a group that already does so. Where the same funds are available for them to express their disagreement, the burden on their speech is minimal. For these reasons, I respectfully dissent from the denial of rehearing *en banc*.

DIANE P. WOOD, Circuit Judge, with whom ROVNER and EVANS join, Circuit Judges, dissenting from denial of rehearing *en banc*.

It would be difficult to overstate the ramifications of the panel's conclusion that the First Amendment prohibits student associations at public universities from distributing a common fund to a particular student group, if one or more students at the university find the recipient's message offensive. I fear this will spell the end, as a practical matter, to the long tradition of student-managed activities on these campuses. If the First Amendment indeed compelled such a result, then we would have no choice but to enforce it. But in my view, neither the text of the First Amendment nor the relevant Supreme Court precedents call for any such outcome. The unfortunate consequences of an erroneous legal conclusion here are reason enough for the *en banc* court to give this case its full consideration. But there are other reasons as well that underscore the appropriateness of *en banc* review: (1) there is a conflict in

the circuits, see *Carroll v. Blinken*, 957 F.2d 991 (2d Cir.1992) and *Carroll v. Blinken*, 42 F.3d 122 (2d Cir.1994); (2) important and unsettled questions of law exist, insofar as the majority is relying on the views of the plurality of four members of the Supreme Court in *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); and (3) ironically, the panel's decision appears to create a serious conflict with the premise underlying the Supreme Court's decision in *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). For the reasons that follow, I therefore respectfully dissent from the *en banc* court's decision not to rehear this case.

Among the required payments that students registered at the University of Wisconsin must tender, in addition to their tuition payment, is a student activity fee. The University turns a portion of the monies collected over to the Associated Students of Madison (the ASM, or student government), which in turn creates its own budget and allocates surplus funds to various student groups, University departments, community-based service organizations, and registered student organizations. Some of the recipients engage in activities with a political or ideological dimension. In the panel's view, the University's decision to require students to support the ASM and its allocation decisions is tantamount to requiring every individual student to subsidize the speech of every group funded by the ASM. This logical step allows the panel to equate the funding of the ASM to the compelled subsidization of speech addressed in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), and *Lehnert, supra*. Based on this equation, the panel concludes that the mandatory student activity fee violates the First Amendment rights of any students who disagree with the message of any of the funded groups. Finally, the court constructs a remedy that would allow dissenters to opt out of that portion of the fee ultimately earmarked for the objectionable group.

I take issue with the panel's fundamental premise—that the fee is a compelled subsidy of speech itself, rather than a compelled subsidy of a *neutral forum* for speech. In my view, there is a dispositive difference for First Amendment purposes between requiring someone to fund a forum, and requiring someone to support the speech of any or all speakers who come to use the forum. The Supreme Court's decision in *Rosenberger* provides strong support for the characterization of the student activity fee as a forum for speech, which can then be used "to encourage a diversity of views from private speakers." 515 U.S. 819, 830, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Access to that forum, *Rosenberger* makes clear, must be handled on a nondiscriminatory basis: atheist students cannot deny access to the Christian fundamentalists; abortion rights advocates cannot deny access to an organization dedicated to pro-life principles; and Republicans cannot deny access to Democrats.

The panel takes the position that there is no meaningful distinction between a forum for speech and the speakers who use that forum. Again, I respectfully disagree. Different principles control the analysis of compelled funding of a neutral forum than compelled funding of a particular group or speaker. See *Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510. It is commonplace to require the funding of a neutral forum: the taxpayers of the United States support the Mall in Washington, which is used by countless speakers with a virtually infinite range of viewpoints. Even though the government is not entitled to require a citizen to fund the Catholic Church, it is entitled to permit the Pope to conduct a mass on the Mall. See *O'Hair v. Andrus*, 613 F.2d 931, 934 (D.C.Cir.1979). At some level of generality, this means that non-Catholic citizens have been forced to "subsidize" the religious message that the Pope delivers, but the link is too remote to offend the First Amendment. Indeed, the First Amendment pushes in the other direction, for if the government had to censor the speech of users of the Mall to ensure that it was not offensive to anyone in the country, all it could do would be to close the forum.

Closer to the facts of this case, the University of Wisconsin obviously compels its students to make other payments as well, notably tuition. Just as is the case with the activity fee, students at the University of Wisconsin cannot graduate or receive their grades if they fail to pay their tuition. But what happens to the funds generated by tuition? The University uses them for its operations, and the lion's share of the budget in most universities goes to faculty salaries and research support. Some students undoubtedly find the viewpoints of some faculty members, expressed either in the classroom or in scholarship, to be offensive. Suppose, for example, there is a doctor in the medical school researching more effective ways to use fetal tissue for organ transplants. It is easy enough to imagine a student finding this antithetical to her religious or moral views. Or suppose the University disburses tuition funds to a sociologist who is exploring the hypothesis that children suffer long-term harm if their mothers work while the child is still under the age of 10. A different student may find that equally offensive. (One might say that a student knows *ex ante* that a university has tenured a faculty member with views offensive to that student, and she implicitly agrees to have part of her tuition allocated to that professor when she decides to attend the university. But by the same token the student knows that there is a student association, and she knows something about the demographics of the student body. More than that, unlike a tenured faculty, the membership of a student association changes quickly, and the student has a voice in its composition. More importantly, however, *ex ante* knowledge cannot cure what would otherwise be a First Amendment violation. No one would say that a worker who objected to a union's activities under *Communications Workers of America v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), had lesser rights just because the worker knew when she joined the company what the union was doing. The analogy between the offensive professor and the offensive student group is therefore a close one.) The First Amendment surely does not mandate that researchers be funded on a consenting-student-by-consenting-student basis on the theory that tuition is a compelled subsidy of these researchers' speech. Just

as the University as an institution is not espousing the viewpoints of any individual faculty members, the ASM is also not espousing the viewpoints of any of the organizations it funds. Here, both the ASM and the University are doing nothing more than creating the forum for the expression of other people's views. It is the same as if they simply built a large auditorium and held it open for everyone.

The fact that a forum-creation analysis rather than a compelled speech analysis is appropriate here means that *Abood, supra,* and *Keller, supra,* provide only limited help in resolving this case. Important distinctions exist between the relationship between dissenters and speakers there, and the relationship here. Neither the union nor the bar association in those cases created a viewpoint-neutral forum, as the ASM does (and must in the wake of *Rosenberger*). In *Abood* and *Keller,* the organizations at issue were pursuing their own political agendas, and they funded recipient organizations' speech on the basis of viewpoint. The *Abood* and *Keller* plaintiffs' objection to being forced to contribute despite their opposing beliefs was, in essence, an objection to compelled political speech. Here, in contrast, the objecting students are required to fund the ASM, which in turn funds a vast array of recipient organizations regardless of viewpoint—indeed, often with conflicting viewpoints. There is a crucial difference between a requirement to pay money to an organization that explicitly aims to subsidize one viewpoint to the exclusion of other viewpoints, as in *Abood* and *Keller,* and a requirement to pay a fee to a group that creates a viewpoint-neutral forum, as is true of the student activity fee here. The former is subject to additional First Amendment constraints and must therefore allow dissenters to opt out of the fund; the latter satisfies the First Amendment's concerns with the plurality of views inherent in its viewpoint-neutrality.

Nothing in *Lehnert, supra,* is to the contrary. The issue presented in that case concerned "the constitutional limitations, if any, upon the payment, required as a condition of employment, of dues by a nonmember to a union in the public sector." 500 U.S. at 511, 111 S.Ct. 1950. The Court found that *Abood* applied, and it analyzed various particular expenditures that the nonmembers either could or could not be required to support. But these were all direct payments to the organization engaging in the "speech"; nothing like a viewpoint-neutral forum was involved. I do not find *Lehnert* the compelling precedent for this case that the panel did, even apart from the fact that the panel concedes it is relying on one of the parts of the opinion that commanded only a plurality of the Court.

The panel may think it a matter of little moment if the University cannot collect, even temporarily, the few dollars from dissenting students that had been destined for the organizations to which they object. I am not so sanguine. Indeed, I fear that the rule announced in this case, in combination with *Rosenberger,* will logically result in excluding everyone. Just as these plaintiffs have a "hit list" of organizations to which they object, other students will have their own lists. At a large and diverse university like the University of Wisconsin at Madison, some students will almost certainly object just as strongly to a Christian Coalition, or to the Federalist Society, or to the Pro–Life Action League as these plaintiffs do to WISPIRG, the Campus Women's Center, the Lesbian, Gay, Bisexual Campus Center, and the rest. *Some* students will object on ideological grounds to virtually every organization funded by the ASM. The transaction costs attendant to soliciting and processing the individual preferences of each of the 40,196 students at this university, to reduce the semester fee from $165.75 to some lower number, would be prohibitive. In the end, grafting dissenters' rights onto a neutral forum for the expression of a full panoply of viewpoints will most likely eliminate the forum altogether, which is a perverse way indeed to safeguard the kind of free and open political and intellectual debate that lies at the heart of the First Amendment, and that is especially important in a university setting, see, *e.g., Carroll v. Blinken,* 957 F.2d 991, 999–1001 (2d Cir. 1992). This surely turns *Rosenberger* on its head, transforming it into the instrument that undoes the very "tradition of thought and experiment" the Court so vigorously sought to protect. 515 U.S. at 835, 115 S.Ct. 2510. Further, eliminating the forum would

also deprive the students of the opportunity to serve their community and develop the kind of skills required to run a student association, a student union, or a like group.

In sum, I believe the panel erroneously analyzed the mandatory student activity fee at the University of Wisconsin as the compelled subsidy of specific instances of speech rather than as the compelled creation of a neutral forum for speech. This error has serious and harmful consequences, at odds with the First Amendment rather than compelled by it, which will be felt at all public universities in this circuit. It will needlessly reduce the quality of education and experience these institutions can offer matriculating students. I therefore respectfully dissent from the court's decision not to rehear the case *en banc*.