# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-2314

SCOTT H. SOUTHWORTH and BENJAMIN THOMPSON,

*Plaintiffs-Appellees,*

v.

BOARD OF REGENTS OF THE UNIVERSITY
OF WISCONSIN SYSTEM,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 96 C 292—**John C. Shabaz**, *Judge.*

ARGUED JANUARY 13, 2004—DECIDED JULY 23, 2004

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* This is the fifth time this case is before this court.[1] At issue in this appeal is the district

---

[1] *Southworth v. Grebe,* No. 97-1001, 1997 WL 411225 (7th Cir. July 11, 1997); *Southworth v. Grebe,* 151 F.3d 717 (7th Cir.), *rehearing denied,* 157 F.3d 1124 (7th Cir. 1998), *rev'd sub nom. Bd. of Regents of the Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217 (2000);
(continued...)

court's award of attorneys' fees and costs to the Plaintiff-Appellees, students (the "Students") in the University of Wisconsin System (the "University").[2] The district court awarded the Students these fees and costs in litigation challenging the funding of certain groups by the University as violative of the Students' constitutional rights. Because the Students prevailed in part, we hold that the district court did not err in its award and we affirm its decision.

## I.

The collection and distribution of mandatory fees paid by students to the University prior to this litigation, and as a result of this litigation, has been set forth in great detail in previous opinions of the district court, this court, and the Supreme Court. We do not recite them in their entirety again here. Nevertheless, a certain degree of renewed familiarity with the disbursement of these funds and, more importantly, the procedural history of this case is important to the resolution of this appeal.

---

[1] (...continued)
*Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, Nos. 97-5310, 97-3548, 2000 WL 831585 (7th Cir. June 23, 2000); *Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, 307 F.3d 566 (7th Cir. 2002). Of these decisions, the most important for resolving the current dispute are our reported opinions. For ease of reference, therefore, we refer to our first reported decision (151 F.3d 717) as "*Southworth I*" and our second reported decision (307 F.3d 566) as "*Southworth II.*"

[2] Although stylized a suit against the University of Wisconsin System, the facts relied on here relate specifically to the Madison campus and the Appellees are, or were, all students enrolled at that campus.

The University collects a mandatory student activity fee from all students enrolled full-time. By state statute, responsibility for the allocation of these fees is shared by the Board of Regents for the University and students at the University through their student government representatives. A portion (by far the larger portion) of the collected fees are classified by the Regents as nonallocable. This portion is used to cover expenses such as debt service, student health services, and the University's intramural sports program. This nonallocable portion is not at issue here. The remainder of the fees are classified as allocable and are largely controlled by the University's student government body, the Associated Students of Madison (the "ASM"), although, as we shall see, the measure of control and discretion exercised by the ASM has changed over the course of this litigation.

A. *The Allocable Fees—Pre-Litigation*

At the outset of this litigation, a party interested in receiving a portion of the allocable fees could do so through three means. First, a "Registered Student Organization" (an "RSO")[3] could receive a portion of these fees through an application to a committee of the ASM, the Student Services Finance Committee (the "SSFC"). The SSFC is responsible for the allocation of that portion of the fees held in the General Student Services Fund (the "GSSF"). Second, an RSO could apply for a grant drawn from the Student Government Activity Fund (the "SGAF") to support three separate categories of activities: operations, events, and travel. The SGAF is

---

[3] To qualify as an RSO a group must be a formalized not-for-profit group, composed mainly, but not necessarily exclusively, of students, and controlled and directed by students.

administered through another committee of the ASM, the Finance Committee. Finally, an RSO could seek funding through a student referendum.[4]

At the time this litigation was initiated, the SSFC had ten guidelines for making GSSF funding decisions:

> 1. An applicant must be an [RSO] that provides an important, ongoing service to significant numbers of [University] students. These services should contribute significantly to student health, safety, well-being, participation, opportunity or education.
>
> 2. The service must be not-for-profit.
>
> 3. When serving both students and non-students, the SSFC will generally only consider funding portions of programs serving students.
>
> 4. The SSFC will generally consider funding only those portions of programs directed by students.
>
> 5. Services receiving fees are expected to abide by all SSFC, campus, state and federal wage policies.
>
> 6. GSSF funding is not intended to replace any reductions in funding previously exclusively funded through tuition or "GPR" moneys.

---

[4]  For ease of reference, the following is a recap of the abbreviations utilized in discussing the funding system:

> ASM—Associated Students of Madison
>
> RSO—Registered Student Organization
>
> SGAF—Student Government Activity Fund
>
> GSSF—General Student Service Fund
>
> SSFC—Student Services Finance Committee

7. Capital expenditures are provided for equipment that will substantially enhance the service offered to students only when other funding avenues have been exhausted.

8. All expenditures and revenues by student groups must be documented and made available.

9. Where possible, there must be a record system for measuring the number of students served.

10. Services that receive more than 30% of their budget from student fees and have an advisory board shall have a SSFC-appointed liaison.

*Fry v. Bd. of Regents of the Univ. of Wisconsin System*, 132 F. Supp. 2d. 744, 746-47 (W.D. Wis. 2000). An RSO that sought to appeal the funding decision of the SSFC could appeal to the ASM Council and subsequently to the Chancellor of the University.

The guidelines for SGAF grants depended on the type of grant. For grants to cover operations and events, the guidelines stated that the awards could not be used for "(1) fundraisers, (2) food and beverages, (3) gifts, donations or contributions, (4) financial aid, (5) legal services, (6) expenses incurred prior to ASM approval, (7) wages, (8) non-university printing services, (9) event funding, (10) telephone charges, and (11) conference/travel costs." *Fry*, 132 F. Supp. 2d at 747. The guidelines for travel grants appear to have been limited to a requirement that the travel would be central to the purpose of the RSO. Like SSFC decisions, SGAF decisions could be appealed from the ASM finance committee to the full ASM Council.

Under Wisconsin law, the decisions of the ASM Finance Committee, the SSFC, and the ASM Council were sent to the Chancellor and the Board of Regents for their approval. The

Board did not approve or disapprove individual funding decisions but, instead, voted on the budget of the ASM, "which contained a line item or line items representing an aggregate amount of [student] fee expenditures." *Id.*

B.   *The Litigation—Round One*

In March 1996, the Students filed suit in the District Court for the Western District of Wisconsin. The Students' primary allegation was that the collection of a mandatory fee (at least that portion that was allocable) violated their rights of free speech, free association, and free exercise under the First Amendment. The Students argued that requiring them to pay the fee, part of which was distributed to RSOs, amounted to forcing them to fund RSOs engaged in political and ideological expression offensive to their beliefs. In support of their argument, the Students cited funding to groups including the Wisconsin Public Interest Research Group ("WISPIRG"), the Lesbian, Gay, Bisexual Campus Center, the Campus Women's Center, the UW Greens, the Madison AIDS Support Network, the International Socialist Organization, the Ten Percent Society, the Progressive Student Network, Amnesty International, United States Student Association, Community Action on Latin America, La Colectiva Cultural de Aztlán, the Militant Student Union of the University of Wisconsin, the Student Labor Action Coalition, Student Solidarity, Student NOW, MADPAC, and the Madison Treaty Rights Support Group. In their initial complaint, the Students stipulated that the University distributed funds through the SSFC and the SGAF to RSOs in a viewpoint-neutral manner. This stipulation did not, however, cover funds distributed through the referendum method of funding.

The district court granted summary judgment in favor of the Students. This court affirmed. *Southworth I,* 151 F.3d 717

(7th Cir. 1998). The Supreme Court granted certiorari, however, and reversed. *Bd. of Regents of the Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217 (2000). While recognizing that "students who attend the University cannot be required to pay subsidies for the speech of other students without some First Amendment protection," *id.* at 231, the Supreme Court held that this protection was not achieved by a blanket prohibition on the use of allocable fees to fund the groups listed above (or similar groups) or a refund (or similar opt-out mechanism) to dissenting students. *Id.* at 230 ("[T]he means of implementing First Amendment protections adopted in [*Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977) and *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990)] are neither applicable nor workable in the context of extracurricular student speech at a university."). Instead, the protection for the Students' First Amendment rights is the requirement that the University allocate these funds in a viewpoint-neutral manner. *Id.* at 233 ("The proper measure, and the principal standard of protection for objecting students, we conclude, is the requirement of viewpoint neutrality in the allocation of funding support."). The Supreme Court expressed doubt concerning, *but did not rule on*, the propriety of the referendum method of funding. *Id.* at 230 ("The student referendum aspect of the program for funding speech and expressive activities, however, appears to be inconsistent with the viewpoint neutrality requirement."). The Court held that it was necessary to remand the case to determine "what protection, if any, there is for viewpoint neutrality in [the referendum method of funding]." *Id.* at 235.

## C. *The Litigation—Round Two*

Following the Supreme Court's decision, this court remanded the case to the district court. *Southworth*, 2000 WL 831585, at **4. This court, while expressing doubt as to its

constitutionality, instructed the district court on remand to consider the constitutionality of the referendum method after the development of a more complete record. *Id.* at **3. This court also remanded the case to the district court for consideration of the Students' request for leave to amend their complaint and for leave to withdraw their stipulation that the University administered SGAF and GSSF funds in a viewpoint-neutral manner. *Id.* While finding that the Students' request, in light of the Supreme Court's decision, "seems reasonable," this court left the request to the district court to consider on remand. *Id.* at **4.

On remand, the district court voided the Students' stipulation and granted the Students' motion to amend their complaint.[5] The Students' amended complaint alleged that the University's system failed the requirement of viewpoint neutrality by vesting the student government with unbridled discretion in making allocation decisions.[6]

In December 2000, the district court conducted a bench trial on the Students' amended complaint. At the conclusion

---

[5] The district court did not ultimately consider the constitutionality of the referendum method of funding. On May 3, 2000, the University's president, citing the Supreme Court's opinion, abolished the referendum method of funding. This action was taken prior to the order of this court remanding the constitutionality of the referendum method to the district court. It appears, however, that this court was not made aware of this when we ordered the remand. The parties later stipulated to the dismissal of the Students' claims concerning the referendum method of funding.

[6] The Students' amended complaint also alleged that the funding system failed to ensure viewpoint neutrality because the University barred the funding of partisan political and religious organizations. Before trial, the University eliminated this prohibition.

of the trial, the district court issued an oral ruling that the University's mandatory fee system violated the plaintiffs' First Amendment rights by granting the student government too much discretion for determining which student organizations to fund. Four days later, the district court issued a written Supplemental Decision and Order further explaining its oral ruling. Specifically, the district court explained that after reviewing the guidelines for funding set forth above, "no objective standards exist to determine which eligible student groups receive the funds compelled from the student body." *Fry*, 132 F. Supp. 2d at 749. The court found that "[d]ecisions as to who receives funding and in what amounts are left to the complete discretion of the student officials on student government committees." The court recognized that there was an appeals process but held that "those hearing the appeals are no more bound by objective standards than the original decision-makers." *Id.* The court also found that the absence of objective standards for SGAF and GSSF funding decisions meant that these funding decisions suffered from the same defect of the referendum method criticized by this court and the Supreme Court, namely, that the decisions were an exercise of majoritarian rule that was inconsistent with the principle of viewpoint neutrality. *Id.* at 750.

Importantly, however, the district court deferred entry of its judgment for two months to permit the University "to establish a system which operates in a viewpoint neutral manner." *Id.*

In response to this order, the University instituted a series of extensive changes to its funding system and submitted these changes to the district court for its consideration. These new policies are set forth in great detail in this court's October 2002 decision. *See Southworth II*, 307 F.3d at 581-88.

The district court reviewed the University's new policies but found that even these policies did not "address the

central constitutional defect," namely, that the discretion afforded the student government committees remained unchecked. *Fry v. Bd. of Regents of the Univ. of Wis. Sys.*, No. 96-C-0292-S, slip op. at 3 (W.D. Wis. March 15, 2001). The district court found that many of the criteria for determining funding were "inherently subjective and malleable and provide for the use of expansive discretion." *Id.* Finally, the court noted that the new system did not balance the University's announced goals of funding diverse speech and, at the same time, "empower[ing] student government to be the arbiter of that funding," and questioned whether such a balance could be found that was "viewpoint neutral and protects the First Amendment rights of objecting students." *Id.* at 4.

This court affirmed in part, and reversed in part, the district court's decision concerning the new policies. This court held "that the University's Funding Standards, as a whole, substantially limit the discretion of the SSFC and the ASM Finance Committee as to the GSSF grants and SGAF operation and events grants." *Southworth II*, 307 F.3d at 592-93. We did, however, find that "a few of the criteria relied upon by the University are related to the RSO's speech or viewpoint, and thus are improperly considered by the student government." *Id.* at 593. Specifically, this court found that because the funding of travel grants was not guided by the same criteria as funding for operation and events grants, "the University cannot use the mandatory student activity fees of objecting students to fund the travel of groups engaged in political, religious or ideological activities or speech." *Id.* at 595. In addition, we rejected as improper criteria for funding that considered "the length of time an RSO has existed and the amount of past funding it has received." *Id.*

That decision was the last decision on the merits in this litigation. We issued our opinion on October 1, 2002 and set

forth an amended opinion the next day. On October 24, 2002, we issued our mandate to the district court.

### D.  *The Current Dispute*

We turn now to the facts surrounding the award of attorneys' fees and costs. In December 1996, the district court issued an order concerning attorneys' fees and costs (the "1996 Order"). The 1996 Order stated that "[t]he plaintiffs' deadline for filing their request for attorney's fees and costs in this case is 30 days after the expiration of the time period for appeal, or, if the decision is appealed, until 30 days after all appeals are completed in this case." The district court issued a second order concerning attorneys' fees on April 10, 2001 (the "2001 Order"). In this second order the court deferred the filing of applications for attorneys' fees or costs "until thirty days after the issuance of the mandate to this court following the resolution of all appeals."

As we have noted, this court issued its mandate to the district court on October 24, 2002. More than three months later, on January 28, 2003, the Students filed a motion with the district court under 42 U.S.C. § 1988 for $423,395.72 in attorneys' fees and costs ($394,690 in attorneys' fees and $28,705.72 in costs).

The University opposed the Students' motion on two grounds. First, the University challenged the timeliness of the Students' motion. The University argued that the 2001 Order required the Students to file their motion for fees and costs within thirty days of the return of our mandate to the district court. Under this interpretation of the 2001 Order the Students' request was more than two months late.

The University also argued that, even assuming the Students' motion was timely, the Students were not prevailing

parties eligible under § 1988 for an award of costs and fees. The University argued, in effect, that in 2003 it was continuing to do the same thing it had done when the litigation started in 1996, namely, using mandatory fees collected from the Students to fund political and ideological groups with viewpoints opposed by the Students. The University also argued that any victory the Students could claim with respect to their argument concerning viewpoint neutrality was merely a moral victory. There was, the University argued, little if any actual change in the University's behavior and there was no evidence that the University had ever allocated funds in a manner that was not viewpoint-neutral.

The district court disagreed with the University on both arguments. The district court held that the Students' motion was not untimely. The court agreed with the Students' argument that the 2001 Order merely reaffirmed the 1996 Order and that the 1996 Order's language that a request for fees and cost could be filed up to thirty days "after the expiration of the time period for appeal" meant that the thirty days began to run at the expiration of the period during which either party could petition for a writ of certiorari from the Supreme Court. The court held that "[t]o wait thirty days until the time for appeal expires is no burden on either party and may save judicial resources and the expenditure of fees."

The district court also held that the Students were a prevailing party. The court concluded that:

> As a result of this litigation the process by which funding decisions are made has been altered in two important ways. First, detailed viewpoint-neutral criteria have been instituted significantly limiting funding discretion. Second, a procedure was established to permit appeal of an allocation made on a viewpoint discriminatory basis. Unquestionably these changes significantly altered the

legal relationship between the parties rendering plaintiffs prevailing parties under § [1987].

*Southworth v. Bd. of Regents of the University of Wis. Sys.*, 96-C-292-S, slip op. at 4 (W.D. Wis. April 11, 2003).

The district court did not award the Students all of their request, however. The court found that the relief the Students obtained "was less than that which they sought until the Supreme Court decision." *Id.* at 5. The court, therefore, reduced the award of costs and fees by one-half and entered judgment in favor of the plaintiffs in the amount of $211,697.86. This appeal followed.

## II.

On appeal the University raises the same arguments against the award as it did in opposing the motion before the district court. First, the University argues that the Students' motion for fees was untimely. Second, the University argues that the Students were not a prevailing party entitled to fees and costs. The University does not, however, contest the amount of fees awarded should these challenges not succeed. We address each argument in turn.

### A. *The Timeliness of the Students' Motion*

The University first argues that the Students' request for fees was untimely. The 1996 Order and the 2001 Order, the University argues, were not compatible and established different rules for requesting attorneys' fees. As a consequence, the University argues, the latter of these orders, the 2001 Order, is controlling and required the Students to make a motion for fees within 30 days after the issuance by this court of its mandate to the district court. Such an interpretation would have made the Students' motion timely only if

it were made on or before November 23, 2002. The Students made their motion nearly two months later.

The Students argue that the orders are not incompatible, and that the 2001 Order merely reaffirmed the 1996 Order. Each party, the Students argue, could have petitioned for a writ of certiorari from the United States Supreme Court following our decision in *Southworth II.* The time for filing such a petition runs for 90 days from the date the opinion sought to be reviewed is filed. Supr. Ct. R. 13.1. Thus, according to the Students, a motion for attorneys' fees was not untimely until 30 days after the expiration of the time during which the Students (or the University) could have sought a writ of certiorari from the Supreme Court. This court's opinion in *Southworth II* was filed on October 1, 2002 and an amended decision was filed the next day. Ninety days later was December 31, 2002 (counting from the date the amended decision was filed). The parties, therefore, had until January 30, 2003 to file a motion for costs and fees. By such a calculation, the Students' motion, filed on January 27, was timely.

Our resolution of this issue is guided by the broad deference given to a district court in its interpretation of its own orders. "That court is in the best position to interpret its own orders." *In re Chicago, Rock Island & Pacific R.R. Co.*, 860 F.2d 267, 272 (7th Cir. 1988). We will not reverse a district court's decision in these circumstances " 'unless the record clearly shows an abuse of discretion.' " *Id.* (quoting *Arenson v. Chicago Mercantile Exch.*, 520 F.2d 722, 725 (7th Cir. 1975)). We think this deference is particularly important where the district court is interpreting an order that is (at least in part) aimed at managing post-trial scheduling issues. *Cf. Smith v. Village of Maywood*, 970 F.2d 397, 399 (7th Cir. 1992) (per curiam) ("We have emphasized the need for flexibility and good sense in interpreting time limits on attorney's fee petitions.").

The district court did not abuse its discretion. The district court interpreted its order in such a way that the application would be timely only after the parties had exhausted all appeals (including a petition for a writ of certiorari) or had forgone an opportunity to appeal, thus permitting the application for fees to be all-inclusive. We have approved such an approach to attorneys' fees before. In *Village of Maywood*, we discussed approvingly one district court judge's approach to the Northern District of Illinois' Local Rule 46. That local rule requires the filing of an application for fees within 90 days of a "final judgment." The district court's approach was that a final judgment for the purpose of fee petitions included the consideration of appeals. *Id.* This court noted that "[d]elaying the filing of fee petitions cuts down on multiple petitions and time wasted on petitions that may be reversed on appeal." *Id.* The district court's interpretation of its orders in this case was motivated by the same consideration: "[t]o wait thirty days until the time for appeal expires is no burden on either party and may save judicial resources and the expenditure of fees." *Southworth*, 96-C-292-S, slip op. at 3. The situation is similar here. The University has not argued that it was prejudiced or burdened by having the district court consider the fee petition in early 2003 rather than late 2002. The petition for fees was timely.

B.   *Whether the Students Are Prevailing Parties*

The University next argues that, even if the district court did not err in finding the Students' motion for costs and attorneys' fees timely, the district court erred in concluding that the Students were prevailing parties. Classifying the Students as "prevailing parties" is significant because, in a suit brought under 42 U.S.C. § 1983, a court may award plaintiffs reasonable attorney fees as part of the costs, if they

are prevailing parties. 42 U.S.C. § 1988(b). "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992).

In this case, the district court found that the Students were prevailing parties because their suit altered their legal relationship with the University in two ways. First, the University established detailed criteria limiting the discretion in the allocation of mandatory student fees to various organizations, thus protecting against viewpoint discrimination. Second, the University established an appeal procedure to ensure that student fees are allocated in a viewpoint-neutral manner that avoids viewpoint discrimination, thus further limiting the discretion of the University. Because, however, the Students ultimately lost on their original claim that forced funding of speech through the mandatory student activity fee system violated the First Amendment, the district court concluded that they were not entitled to the full amount of attorneys' fees. Accordingly, the district court reduced the costs and fees requested by one-half.

On appeal, the University does not challenge the amount of the award. Rather, it argues that the Students were not entitled to costs and fees because they were not prevailing parties. In making this argument, the University posits that our standard of review is *de novo,* while the Students maintain that we review solely for clear error. The appropriate standard of review depends on the circumstances. If the question of prevailing party status involves elements of a legal analysis, then our review is *de novo. Harper v. City of Chicago Heights*, 223 F.3d 593, 603 (7th Cir. 2000). Conversely, if the issue is whether the plaintiff directly benefits, that "is a factual determination which we review only for clear error." *Cady v. City of Chicago*, 43 F.3d 326, 329 (7th Cir.

1994). Or, as we explained in *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 932 (7th Cir. 2003), "[a]lthough the decision to award attorney's fees under § 1988 lies within the district court's discretion, when . . . an attorney's fee award rests on the application of a principle of law, our review is *de novo*." *Id.* In this case, because the University claims that the Students did not directly benefit from the various court rulings, as opposed to challenging the application of a principle of law, we review the district court's decision for clear error. However, we note that even under the more searching *de novo* standard, our analysis, *see infra*, would not change.

As noted, the University argues that the Students were not prevailing parties. In making this argument, the University offers several different rationales. First, the University claims that the Students did not prevail because their desire in bringing suit was to prohibit the University from collecting mandatory student activity fees and distributing those fees to organizations which engaged in political and ideological speech with which they disagreed. Quoting *Cady*, the University argues that determining whether a party has prevailed requires a "pragmatic assessment of the goals the plaintiffs had in mind in bringing the suit and the extent to which they achieved those ends." 43 F.3d at 330-31. The University reasons that the Students failed to achieve their goal because "[w]hen the [Students] brought this action they were required to pay a mandatory student activity fee that could be used to fund groups with positions and views to which they objected. Now that the litigation has been concluded, [the Students] are still required to pay a mandatory student activity fee that can be used to fund groups with positions and views to which they object." Appellee Brief at 18. Therefore, the University contends, the Students were not prevailing parties.

The University's argument is misplaced. The district court did not find that the Students were prevailing parties on their original complaint's attempt to bar the forced funding of political and ideological speech through the mandatory student activity fees. The Students clearly lost on that claim. The district court correctly denied the Students attorneys' fees to the extent that such fees were generated from that claim.

This litigation did not end with the Supreme Court's decision, however. After losing on their first claim, the Students amended their complaint and alleged that the mandatory fee system failed to satisfy the requirement of viewpoint neutrality. As discussed below, the Students were prevailing parties on this amended complaint.

First, as detailed above, in response to the district court's 2002 holding that the University's funding system violated the principles of viewpoint neutrality and the district court's order allowing the University to adopt a new method, the University established detailed standards for the allocation of student activity fees. It also created an appeal process for challenges to funding decisions. The district court, however, found those policies lacking, concluding that the "discretion afforded the student government committees remained unchecked." *Fry*, 96-C-0292-S, slip op. at 3. It was this revised system of funding, and not the previous system, that we considered in *Southworth II.* Unlike the district court, we concluded that the new guidelines sufficiently bridled the University's discretion. We struck, however, certain impermissible factors from consideration by the University in its funding decisions. *Southworth II*, 307 F.3d at 592-94. Specifically, this court found impermissible the University's consideration of the length of time an RSO existed and the amount of past funding as factors in whether to fund and the level of funding an RSO could receive. *Id.* at 593-94. We

also held that funding of travel grants was impermissible because the University failed to present any evidence that it had established procedures limiting the decisionmakers' discretion for these grants. *Id.* at 592.

In this second round of litigation, therefore, the Students were prevailing parties in two ways. First, the Students obtained a court ruling in the district court that the mandatory fee system violated the principle of viewpoint neutrality, and in response to the district court's order, the University adopted the detailed procedures, criteria, and appeals process governing funding decisions. The University did not challenge the district court's ruling that the original fee system violated the principle of viewpoint neutrality by granting the University unfettered discretion. Instead, in response to that ruling, the University altered the mandatory fee system and it was the district court's decision concerning this newly adopted system that this court affirmed in part, and reversed in part. The Students thus prevailed in obtaining the protection they sought in their amended complaint—a mandatory fee system that satisfied the requirements of viewpoint neutrality—and this change resulted from a "court-ordered 'change in the legal relationship between the plaintiff and the defendant.'" *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Res.,* 532 U.S. 598, 604 (2001) (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792 (1989)).

On appeal, the University does not address the fact that the system this court found constitutional was adopted only after the Students filed suit and the district court entered an order in favor of the Students. It was the district court's order allowing the University to adopt new standards (and thus avoid a judgment against it) that caused the University to adopt the criteria and procedures upheld in part in *Southworth II.* The University instead claims that, since this court upheld

most of the newly adopted criteria, and only struck minor aspects of the new mandatory fee system, the Students were not prevailing parties. This argument, however, ignores the Students' success in the district court in forcing the University to adopt the new funding criteria in the first place.

The Students also prevailed in a second way on appeal. Although we held that most of the new criteria were valid, the criteria we found impermissible were not insignificant, as the University contends. For instance, this court held that "criteria considering the length of time an RSO has existed and the amount of past funding it has received cannot be considered viewpoint-neutral because those criteria are related to the content and viewpoint of the applying RSO, as well as based on a prior system which lacked the constitutional safeguards of viewpoint neutrality." *Southworth II*, 307 F.3d at 595. Although those were only two of the many criteria established by the University, those two criteria were heavily weighted in past allocation decisions, as demonstrated by the University's explanation during the course of this litigation that the funding decisions began by looking at the prior year's allocations as a benchmark for current grants. *Southworth II*, 307 F.3d at 593. The University had also relied on these criteria to argue in *Southworth II* that "a group in existence for ten years would have a reasonable basis for objecting to a funding decision that treated groups with comparable requests more favorably, which had been around a much shorter time." *Id.* This court rejected consideration of the length of time an RSO was in existence and the amount of past funding decisions because those criteria institutionalized viewpoint discrimination from past years. *Id.* at 593-94. We also held those criteria improper because they discriminated against less traditional viewpoints in favor of

established parties and speech.[7] *Id.* The striking of those criteria thus established a very important protection to the Students' right to a system of viewpoint neutrality.[8]

The University also argues that the Students did not obtain a direct benefit as a result of the litigation because they are still required to pay the student activity fees although they had sought an injunction ordering the University "to stop requiring students to fund campus organizations that engage in political and ideological advocacy." Appellant's Brief at 6. That, however, is only part of the relief the

---

[7] This court also held in *Southworth II* that the University's criterion considering the number of students benefitting from speech was impermissible to the extent it allowed the University to consider the popularity of the speech as a factor in determining funding. *Southworth II*, 307 F.3d at 595. But because there were also legitimate situations when the University would consider the number of students involved, for instance in assessing funding necessary for variable expenses for food or programs for attendees, this court did not strike that criterion. *Id.*

[8] The Students also argue that they prevailed because this court held "that the mandatory fee system unconstitutionally grants the ASM Finance Committee unbridled discretion for awarding travel grants to organizations which engage in speech and expressive activities. Therefore, until such standards are adopted, the University cannot use the mandatory fees of objecting students for such travel grants." *Southworth II*, 307 F.3d at 592. The University responds that by the time of this court's decision, it had already implemented such standards, and therefore the Students did not prevail on this basis. The University, however, failed to supplement the record by providing this court with that information, and thus, on the record before this court, the Students in fact prevailed. Nonetheless, because the University does not challenge the amount of attorneys' fees awarded, whether the Students were prevailing parties on this aspect of the case is irrelevant, since they prevailed on other portions of their case.

Students sought. The Students also sought an order "to stop requiring students to fund campus organizations that engage in political and ideological advocacy . . . *unless or until [the University] establish[es] a system of distributing money that operates in a viewpoint neutral manner.*" Record 96 at 7. (Emphasis added.) Thus, although it is true that the Students must still pay the mandatory fee, they prevailed in vindicating the constitutional guarantee that the distribution system would conform to the requirements of viewpoint neutrality. Moreover, although the University calls this merely a "moral victory," as we explained in *Southworth II*, "the Students' alleged concrete and particularized interest is an assurance that their mandatory student activity fees are distributed in a viewpoint-neutral manner." *Id.* at 573. Thus, the victory was more than moral—it was one protecting "a concrete and particularized interest."[9]

---

[9] The Students also argue that because the University in the 2001-2002 academic year applied the impermissible criteria, they were entitled to money back from the fees they paid in those years. The right to a refund, according to the Students, also demonstrates that they were a prevailing party. The University responds that the Students are not entitled to a refund because they failed to prove any instances of viewpoint discrimination. The University's position is misplaced. As the Supreme Court explained in *Southworth,* a student "cannot be required to pay subsidies for the speech of other students without some First Amendment protection." *Southworth,* 529 U.S. at 231. The First Amendment protection is the requirement of viewpoint neutrality which includes a requirement that the University's discretion is fettered. *Southworth II,* 307 F.3d at 575-80. Thus, if the funding system provides the University with unfettered discretion it violates the mandates of the First Amendment and the University cannot force the students to fund others' speech. *See Southworth II,* 307 F.3d at 593 (holding that the Students could not be forced
(continued...)

The University disagrees, arguing that, rather than having succeeded, the Students are actually in a worse position today because the Students had filed this lawsuit to prevent being forced to fund ideological and political speech with which they disagree, but now there is more money used to fund such organizations because the bar on distributions to partisan political organizations is gone. However, in making these arguments, the University focuses on the first round of litigation instead of the second. In the second round, the Students (recognizing that they would be required to fund such speech) amended their complaint and alleged that the system violated the principles of viewpoint neutrality. The Students succeeded in establishing this violation when the district court ruled that the previous funding system was unconstitutional and the University chose not to appeal this ruling.

Additionally, the University claims that the Students are also worse off now (and thus not prevailing parties) because, before this litigation, the Students could have attempted to convince the University not to fund certain ideological and political speech on the grounds that the organizations' viewpoints did not represent the viewpoints of the Students, but now they are unable to seek defunding of organizations with which they disagree. The University once again confuses the Students' original goal, a ban on forced funding of groups the Students opposed, with their

---

[9] (...continued)
to fund travel grants until the University established criteria limiting the University's discretion). However, because the Students never filed a motion seeking a refund following remand, it is too late to do so now. Nonetheless, the Students have established their status as prevailing parties without reference to any right to a monetary refund.

goal in the amended complaint—protection against viewpoint discrimination. That the Students' previous complaint sought to bar forced funding of organizations with whose viewpoint they disagreed is irrelevant.

The University presents several other arguments as to why the Students were not prevailing parties. For instance, the University contends that several of the changes the University implemented were not required by a court order, such as its abandonment of the referendum method of funding and its elimination of the previous restriction on funding of partisan political and religious activities. Thus, according to the University, under *Buckhannon* the Students cannot base their prevailing party status on these changes.

The University is correct that in *Buckhannon* the Supreme Court rejected the "catalyst theory," holding that a party is not entitled to attorneys' fees merely because the lawsuit served as a catalyst for the change in behavior. *Buckhannon*, 532 U.S. at 605. Rather, as *Buckhannon* explained, there must be a court-ordered change in the legal relationship between the parties. *Id.* at 604. In this case, the University removed its prohibition of funding for partisan political and religious organizations without a court order requiring it to do so. It also eliminated the referendum without a court order. Had the only changes in the University's behavior been to abandon the referendum and the bar on the distribution of funds to partisan political organizations and religious groups, the University might be correct that the Students were not prevailing parties. These were not, however, the only changes. As we have explained, the University substantially revised its funding system in response to a court ruling, and this court struck two significant aspects of the University's funding criteria. Further, because the University does not challenge the amount of costs and fees, we need not detail every aspect on which the Students prevailed so as to determine the proper allocation of attorneys' fees.

The University also argues that the Students did not prevail because they failed to prove that the University allocated funds in a viewpoint-discriminatory way. However, as this court explained in *Southworth II*, "the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement." *Southworth II*, 307 F.3d at 578. In their amended complaint, the Students did not argue that the University engaged in specific incidents of viewpoint discrimination (beyond the prohibition of funding partisan political and religious organizations which the University later removed). Instead, the Students challenged the system for failing to comply with the constitutional prohibition against unbridled discretion. The Students succeeded on this claim, and that entitled them to prevailing party status. *See, e.g.*, *Lewis v. Wilson*, 253 F.3d 1077, 1082 (8th Cir. 2001) (holding that successful facial challenge to decisionmaker's unbridled discretion bestowed "prevailing party" status).

In a final attempt to overcome the district court's ruling that the Students were prevailing parties, the University maintains that the Students were not prevailing parties because nothing has changed: the University may still force the Students to pay the mandatory student activity fee and use that money to fund political and ideological speech with which the Students disagree, and in fact, the organizations which received funding in the past continue to receive funding. For example, WISPIRG, which previously received funding through the referendum method, still receives funds at the same, or a slightly higher, level. The only difference is that the funds are received through a different distribution mechanism.

Notwithstanding the University's claim, much has changed since the inception of this lawsuit. The University now ensures that student fees are dispersed in a viewpoint-neutral manner and, as a result of the district court's order, it has

adopted detailed procedures, funding criteria and an appeal process, most of which this court upheld in *Southworth II*. Moreover, although the University appears to continue the level of funding of some organizations at the same level as under the previously invalid system, this court made clear in *Southworth II* that "consideration of the length of time an organization has been in existence and the amount of funding an organization has received in the past discriminates against less traditional viewpoints." *Id.* at 594. We therefore concluded that "the University cannot consider the length of time an RSO has been in existence, nor the amount of past funding the organization has received, in assessing current funding allocations as those criteria are improperly related to the content of the speech." *Id.* at 594. Contrary to the University's view, *Southworth I* and *Southworth II* changed the status quo.

Furthermore, as we explained in *Southworth II*, "if one RSO applied for funding following the blueprints of another RSO, i.e., similar organizational structure, similar types of activities, similar goals, and similar budgets, but received a lower amount of funding, either the RSO or any student who paid the mandatory student activity fee could present an as-applied challenge in court." *Id*. Thus, the University must treat all viewpoints equally, and the Students succeeded in forcing the University to adopt funding criteria and an appeals process[10] which limit the previously unfettered discretion of the decisionmakers to assure compliance with the constitutional mandate of viewpoint neutrality. *Id.*

---

[10] As we noted in *Southworth II*, "the appeals procedures require the Student Council to compare the grant amounts the SSFC and the ASM Finance Committee allocated to various RSOs to determine whether similar RSO applications were treated equally." *Id.* at 589.

Moreover, as the Supreme Court explained in *Southworth*, "[t]he whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Southworth*, 529 U.S. at 235. Thus, regardless of viewpoint, each applicant should have equal access to the funds available under the comprehensive procedures set out in the University's revised guidelines. Obviously if an application were satisfactorily approved, the applicant would have no objection. But if an application were not approved, and the applicant determined that the rejection was based on the viewpoint he hoped to use the funds to express, he may have a valid challenge within the appeals process, claiming that the decision was based upon viewpoint discrimination. For many, if not most, of the requests for funding, the applicant's viewpoint is obvious. The decisionmakers on the SSFC and the ASM Finance Committee cannot be expected consciously to avoid recognizing the obvious. Rather, with full (or at least some) knowledge of the purpose, the decision must be made based on the objective criteria, viewpoint notwithstanding. No funding should be given or denied based on viewpoint.

Of course, there are many issues that create polarizing viewpoints. The demand for a share of the allocable funds generated by the mandatory fees no doubt exceeds the supply. Thus, every request by an RSO and by others eligible will not be granted. Viewpoint neutrality obviously does not guarantee funding, but it does mandate that all viewpoints have equal access to the limited public forum, be it a pool of funding or a location for gathering and speaking. No organization should have a lock on funding, and the distribution should be determined on a periodic basis based on current applications consistent with the detailed criteria and procedures the University has formulated, which were upheld by this court. If all applicants are treated equally under the same rules, neutrality should be achieved.

Finally, before concluding, we note that had the University argued that the district court erred in calculating the *amount* of the attorneys' fees, as well as the Students' right to attorneys' fees, this claim could have had merit. The district court merely split the Students' requested amount in half, as opposed to awarding attorneys' fees based on the fees incurred on the claims on which the Students prevailed. At oral argument, the Students' attorney maintained that about half of the attorneys' fees were related to work performed after remand from the Supreme Court, but failed to be specific. Because, however, the University did not challenge the calculation of the attorneys' fees award on appeal, the fact that the Students prevailed, at least in part, is sufficient to affirm the entire award of costs and attorneys' fees, as revised by the district court.

### III.

For the better part of a decade, the Students have challenged the collection and distribution of fees by the University. The Students have not been entirely successful in their efforts. The University continues to distribute funds to groups with which the Students disagree. The Students, however, did succeed in several respects. As a result of the Students' efforts, the University has made significant changes to the method by which it funds these groups (and other groups), and established a detailed appeal process. These changes are designed to ensure that the University makes its funding decisions in a viewpoint-neutral manner which would give access to funding by groups with viewpoints that are different or contrary to groups that have been funded in the past. The Students also succeeded in having impermissible criteria stricken from the University's consideration. Because of this, the Students were prevailing parties entitled

to attorneys' fees. We affirm, therefore, the district court's decision to that effect. We also affirm the district court's decision that the Students' motion for fees was timely.

A true Copy:

      Teste:

                                _____

                                 *Clerk of the United States Court of*
                                    *Appeals for the Seventh Circuit*